No. 20-16789

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff/Appellant*,

v.

STATE OF CALIFORNIA, et al.,
*Defendants/Appellees*,

and

INTERNATIONAL EMISSIONS TRADING ASSOCIATION,
ENVIRONMENTAL DEFENSE FUND, and
NATURAL RESOURCES DEFENSE COUNCIL,
*Intervenor-Defendants/Appellees*.

Appeal from the United States District Court for the Eastern District of California
No. 2:19-cv-02142 (Hon. William B. Shubb)

**APPELLANT'S OPENING BRIEF**

JEFFREY BOSSERT CLARK
*Assistant Attorney General*
JONATHAN D. BRIGHTBILL
ERIC GRANT
PAUL E. SALAMANCA
*Deputy Assistant Attorneys General*
STEVEN W. BARNETT
HUNTER J. KENDRICK
ALLEN M. BRABENDER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-5316
allen.brabender@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION .............................................................................1

STATEMENT OF JURISDICTION.....................................................3

STATEMENT OF THE ISSUES...........................................................4

PERTINENT STATUTES AND REGULATIONS .................................4

STATEMENT OF THE CASE..............................................................4

    A.    The United States' climate diplomacy .................................4

        1.    Global Climate Protection Act of 1987 (GCPA) .......................4

        2.    United Nations Framework Convention on Climate Change (UNFCCC) and related agreements..............................5

    B.    California's foreign policy on the global climate .................7

        1.    California's cap-and-trade program...........................................9

        2.    California's linkage with Quebec ............................................10

    C.    Proceedings below.................................................................14

        1.    Treaty and Compact Clause claims .........................................15

        2.    Foreign Affairs Preemption claim ...........................................16

SUMMARY OF ARGUMENT ...........................................................17

STANDARD OF REVIEW .................................................................18

ARGUMENT .....................................................................................18

I.    The Agreement and supporting state laws and agreements are preempted under the Foreign Affairs Doctrine .............................18

A. The Agreement does not advance a traditional state responsibility ..........................................................................20

B. The Agreement intrudes on foreign affairs ..........................................24

II. California's Agreement with Quebec and supporting state laws and agreements violate the Compact Clause ....................................31

A. The Agreement requires congressional approval because it interferes with the just supremacy of the United States..................34

    1. The Agreement exceeds California's powers, encroaching on those of the federal government .....................34

    2. The Agreement limits California's powers to regulate ...................................................................................40

    3. The Agreement and arrangements with Quebec limit California's ability to withdraw .......................................41

B. Legislative practice also shows that the Agreement is of the kind requiring congressional approval......................................42

    1. Through the Clean Air Act, Congress has determined that agreements for the control of air pollution require congressional consent ..............................43

    2. Historic practice further demonstrates that the Agreement must be congressionally approved ........................44

C. Congressional supervision is required to protect against the cumulative impacts of foreign compacts on the just supremacy of the United States ...........................................................46

D. The Agreement is an agreement or compact......................................48

CONCLUSION ...................................................................................................52

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*American Insurance Ass'n v. Garamendi*,
    539 U.S. 396 (2003)..................................................... 1, 2, 20, 26, 29, 30, 32

*Central Valley Chrysler-Jeep, Inc. v. Goldstene*,
    529 F. Supp. 2d 1151 (E.D. Cal. 2007) ........................................30

*Crosby v. National Foreign Trade Council*,
    530 U.S. 363, 377 (2000). ....................................................30, 31

*Deutsch v. Turner Corp.*,
    324 F.3d 692 (9th Cir. 2003) ...........................................2, 25, 29

*Ex parte Holmes*,
    12 Vt. 631 (1840)...........................................................37

*Exxon Mobil Corp. v. EPA*,
    217 F.3d 1246 (9th Cir. 2000) ................................................21

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)................................................1, 19, 30, 35, 49

*Holmes v. Jennison*,
    39 U.S. (14 Pet.) 540 (1840)..........................................36, 37, 53

*International Paper Co. v. Ouellette*,
    479 U.S. 481 (1986).........................................................40

*L.F. v. Lake Washington School District #414*,
    947 F.3d 621 (9th Cir. 2020) .................................................19

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)....................................................5, 6, 30, 41

*Movsesian v. Victoria Versicherung AG*,
    670 F.3d 1067 (9th Cir. 2012) .........................................2, 19, 20, 22–25, 29

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014)........................................................................48

*Northeast Bancorp, Inc. v. Board of Governors of the*
    *Federal Reserve System*, 472 U.S. 159 (1985)..................................34, 50, 51

*Petty v. Tennessee-Missouri Bridge Commission*,
    359 U.S. 275 (1959)........................................................................49

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)........................................................................32

*U.S. Steel Corp. v. Multistate Tax Commission*,
    434 U.S. 452 (1978)........................................... 26, 29, 32–35, 39, 40, 42, 43

*United States v. Pink*,
    315 U.S. 203 (1942)........................................................................19

*United States v. Rauscher*,
    119 U.S. 407 (1886)........................................................................37

*Virginia Uranium, Inc. v. Warren*,
    139 S. Ct. 1894 (2019)....................................................................23

*Virginia v. Tennessee*,
    148 U.S. 503 (1893)............................................................16, 32–34, 37–39

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
    592 F.3d 954 (9th Cir. 2010) ....................................................2, 19, 22–25, 29

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)........................................................................48

*Zivitovsky v. Kerry*,
    576 U.S. 1 (2015)........................................................................48

*Zschernig v. Miller*,
    389 U.S. 429 (1968)..................................................................1, 27, 28, 35

iv

## Constitutional Provisions

U. S. Const. art. I, § 10, cl. 3 (Compact Clause) ............................................3, 32, 49

U.S. Const. art. VI, para. 2 (Supremacy Clause). ............................................3, 4, 19

## Federal Statutes and Court Rules

Global Climate Protection Act of 1987,
Pub. L. No. 100–204, §§ 1101–1106, 101 Stat. 1331,
1407–09, *reprinted as note to* 15 U.S.C. § 2901 .............................................5

28 U.S.C. § 1291 ...............................................................................................4

28 U.S.C. § 1331 ...............................................................................................3

28 U.S.C. § 1345 ...............................................................................................4

International Bridge Act,
33 U.S.C. § 535a ...........................................................................................47

Clean Air Act,
42 U.S.C. § 7402(c) ......................................................................................45

Act of June 25, 1949, ch. 246, 63 Stat. 271 ...................................................46

Act of Sept. 2, 1958, Pub. L. No. 85-877, § 1, 72 Stat. 1701, 1701 .......................46

Act of July 24, 1968, Pub. L. No. 90-419, 82 Stat. 414 .........................................47

S.J. Res. 13, Pub. L. No. 110-171, 121 Stat. 2467 (2007)................................46, 47

Fed. R. App. P. 4 ................................................................................................4

Fed. R. Civ. P. 56 ............................................................................................19

## California Statutes and Regulations

Cal. Gov't Code § 12894(f) .......................................................................11, 12, 39

Cal. Health & Safety Code § 38501(c)-(e) .....................................................21, 27

Cal. Health & Safety Code § 38564.....................................................9, 21

17 Cal. Code Regs. §§ 95940–95943 ................................................9, 10

Cal. Exec. Order No. S-20-06 (Oct. 18, 2006) .......................................10

## Legislative History

The Great Lakes Basin Compact:  Hearing on S. 2688 Before the
    Subcommittee on the Great Lakes Basin of the S. Comm. on
    Foreign Relations, 84th Cong., 2d Sess. (1956)............................................47

## Other Authorities

3 Op. Att'y Gen. 661 (1841).......................................................................37

27 Op. Att'y Gen. 327 (1909).....................................................................37

Frankfurter & Landis, *The Compact Clause of the Constitution—
    A Study in Interstate Adjustments*, 34 Yale L.J. 685 (1925) ........................49

Duncan B. Hollis, *The Elusive Foreign Compact*,
    73 Mo. L. Rev. 1071 (2008) .........................................................................46

Douglas A. Kysar & Bernadette A. Meyler, *Like A Nation State*,
    55 UCLA L. Rev. 1621 (2008)........................................................................7

Chris Megerian, *California Isn't a Country, So Why Are So
    Many in the State Headed to Climate Talks in Paris?*,
    L.A. Times (Dec. 2, 2015)................................................................................7

David Sloss, *California's Climate Diplomacy and Dormant
    Preemption*, 56 Washburn L.J. 507 (2017) ....................................................8

Paris Agreement, Nov. 4, 2016, T.I.A.S. No. 16-1104.............................6

Adam Tanner, *Schwarzenegger:  California is 'Nation State'
    Leading World*, Wash. Post (Jan. 9, 2007) ....................................................7

United Nations Framework Convention on Climate Change, S. Treaty
    Doc. No. 102-38, Art. 2, at 5, 1771 U.N.T.S. 107 (1992)..............................5

## INTRODUCTION

The State of California has entered into an agreement with a foreign government (the Canadian province of Quebec) that pledges political partnership and financial cooperation on an issue of global scope (international climate policy). This agreement integrates and jointly implements state and provincial laws to trade allowances (i.e., credits) to advance California's own international climate policy. In short, this Agreement must be held unconstitutional because our

> system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left *entirely* free from local interference.

*Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) (emphasis added). That is, "foreign affairs and international relations" are "matters which the Constitution entrusts *solely* to the Federal Government." *Zschernig v. Miller*, 389 U.S. 429, 436 (1968) (emphasis added).

Since at least 2003, California unilaterally and repeatedly has entered the sphere of foreign relations. It has enacted laws and taken actions that interfere in the foreign affairs of this Nation as a whole on a variety of issues. California has enacted laws requiring insurers to disclose information about all life insurance policies sold in Europe between 1920 and 1945 to provide assistance to heirs of the victims of the Holocaust. *See American Insurance Ass'n v. Garamendi*, 539 U.S. 396 (2003). California created a cause of action for laborers forced into slavery

during World War II.  *See Deutsch v. Turner Corp*., 324 F.3d 692 (9th Cir. 2003).

California provided state law restitution claims for art stolen during the Holocaust.

*See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th

Cir. 2010).  And California has provided relief to the heirs of the Armenian victims

of the Ottoman Empire from 1915–1923.  *See Movsesian v. Victoria Versicherung

AG*, 670 F.3d 1067 (9th Cir. 2012).  California may have had noble intentions in

enacting these laws, but all of them were rightly struck down as unconstitutional

interferences in foreign policy.

 This Court must act again to keep California in its appropriate constitutional

lane.  California again disagrees with the federal government's actions or inactions.

This time, it is on global climate policy.  California claims to be a global leader in

international climate diplomacy.  Among other actions taken in this area reserved

for the federal government, California has enacted a set of laws creating a cap-and-

trade program for reducing greenhouse gas emissions, expressly seeking national

and *international* partners for its program.  To date, California has found at least

one foreign partner in Quebec.  California entered an agreement and arrangements

linking the two jurisdictions' cap-and-trade programs.  California is actively seeking

agreements and arrangements with other foreign powers.  *See* 4-ER-863, 881;

https://www.law360.com/articles/1325966/9-questions-for-calif-air-board-leader-

mary-nichols (discussing California's efforts to expand its cap-and-trade program).

But the Constitution forbids California to act with foreign governments on this global issue of international climate policy. Thus, as with the state laws in *Garamendi*, *Deutsch, Von Saher*, and *Movsesian*, even if the Court sympathizes with California's desire to take action, this Court must strike down California's express entry into foreign affairs through an agreement with Quebec and the supporting state laws. This agreement or compact with a foreign power requires congressional consent before it may be carried out.

Of course, California has never sought nor received congressional approval. Therefore, as elaborated herein, the district court should be reversed, and the case remanded for entry of judgment for the United States declaring unconstitutional California's agreement with Quebec.

## STATEMENT OF JURISDICTION

(a) The district court had subject matter jurisdiction over the issues on appeal under 28 U.S.C. § 1331 because the United States' claims arose under the U.S. Constitution, Art. I, § 10, cl. 3 (Compact Clause), Art. VI, cl. 2 (Supremacy Clause). 8-ER-1776–77. The district court also had jurisdiction under 28 U.S.C. § 1345 over this civil action commenced by the United States. 8-ER-1751.

(b) The district court's judgment was final because it disposed of all claims against all defendants. 1-ER-2-64. This Court has jurisdiction under 28 U.S.C. § 1291.

(c)     Judgment was entered on July 17, 2020.  2-ER-66.  The United States filed its notice of appeal on September 14, 2020, or 59 days later.  8-ER-1825.  The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.     Whether California's Cap-and-Trade Linkage Agreement with Quebec (the Agreement) and supporting state laws and agreements are preempted under the Foreign Affairs Doctrine.

2.     Whether the Agreement and supporting state laws and agreements are unconstitutional because California has failed to obtain congressional consent for them under the Compact Clause.

## PERTINENT STATUTES AND REGULATIONS

All pertinent constitutional provisions, statutes, and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### A.     The United States' climate diplomacy

### 1.     Global Climate Protection Act of 1987 (GCPA)

The federal government has long been actively involved in the field of global climate policy.  Congress first addressed the United States' foreign policy in this field in the GCPA.  *See* Pub. L. No. 100-204, Title XI, §§ 1101–1106, 101 Stat. 1331, 1407–09 (1987), *reprinted as note to* 15 U.S.C. § 2901.  Among its other

4

goals, the GCPA provides that the United States should "work toward multilateral agreements" on the issue of greenhouse gas emissions. § 1103(a)(4), 101 Stat. at 1408. It assigns to the President and the U.S. Environmental Protection Agency the responsibility for devising a "coordinated national policy on global climate change." § 1103(b), 101 Stat. at 1408. And the GCPA assigns to the President and the Secretary of State the responsibility for coordination of climate change policy "in the international arena." § 1103(c), 101 Stat. at 1409.

### 2. United Nations Framework Convention on Climate Change (UNFCCC) and related agreements

In conformity with the GCPA, in 1992, President George H.W. Bush signed, and the Senate unanimously ratified, the UNFCCC. *See Massachusetts v. EPA*, 549 U.S. 497, 509 (2007) (citing S. Treaty Doc. No. 102-38, art. 2, at 5, 1771 U.N.T.S. 107 (1992)). The UNFCCC is an international treaty. Its objective is to "stabilize greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." 6-ER-1233. The UNFCCC articulates provisions for achieving this objective, including provisions for mitigating climate change, supporting developing countries, and reporting on greenhouse gases and national actions taken to address climate change. 6-ER-1238. In addition, the UNFCCC establishes a Conference of the Parties, which meets annually and serves as a forum for negotiations to take further action towards the UNFCCC's objectives. 6-ER-1239–41.

Since 1992, the UNFCCC process has led to the development of two major multilateral agreements: the Kyoto Protocol (3-ER-469) and the Paris Agreement (6-ER-1255). But the Kyoto Protocol—which called for mandatory reductions in greenhouse gas emissions of developed nations—faced unanimous opposition in the U.S. Senate. President Clinton thus opted not to submit it to the Senate for its advice and consent as an Article II treaty. *See Massachusetts*, 549 U.S. at 509.

More recently, in 2016, President Obama entered into the Paris Agreement as an executive agreement. Paris Agreement, Nov. 4, 2016, T.I.A.S. No. 16-1104 (6-ER-1255). Like the UNFCCC, the Paris Agreement does not mandate that individual parties take any particular approach to climate mitigation. Instead, parties resolve to adopt their own mitigation efforts. The Paris Agreement's goal is to hold the rise of global average temperatures to "well below" 2 degrees Celsius and to "pursu[e] efforts" to limit the increase to 1.5 degrees Celsius. 6-ER-1259. The primary mechanism the Paris Agreement uses to achieve this goal is through each party developing nationally determined contributions (NDCs), which contain planned actions or targets to reduce emissions. 6-ER-1260.

However, President Trump announced after taking office that the United States would withdraw from the Paris Agreement and begin negotiations to either reenter the Paris Agreement or a new agreement with more favorable terms for the United States. 6-ER-1284. The United States officially withdrew from the Paris

Agreement on November 4, 2020, a year after submitting a withdrawal notification consistent with the terms of that agreement. 6-ER-1293.

**B.     California's foreign policy on the global climate**

Over the years, California has made it no secret that it disagrees with the federal government's approach to global climate policy. *See*, *e.g.*, 4-ER-838, 845–49, 851–56; 6-ER-1311–19, 1334, 1388. For example, in 2006, standing next to the British Prime Minister, then-California Governor Arnold Schwarzenegger emphasized that, as a "nation state," California maintains its own foreign policy on issues such as climate change that differs from that of the federal government. *See* Douglas A. Kysar & Bernadette A. Meyler, *Like A Nation State*, 55 UCLA L. Rev. 1621, 1622 (2008) (6-ER-1334); *see also* Adam Tanner, *Schwarzenegger: California is 'Nation State' Leading World*, Wash. Post (Jan. 9, 2007) (6-ER-1388). Even while the Obama Administration was negotiating at the Paris climate talks, California, acting as its own "nation state," sent several state officials to participate in events occurring in conjunction with the negotiations. *See* Chris Megerian, *California Isn't a Country, So Why Are So Many in the State Headed to Climate Talks in Paris?*, L.A. Times (Dec. 2, 2015), http://www.latimes.com/politics/la-pol-sac-climate-california-preview-20151202-story.html.

More recently, mere days after President Trump announced that the United States would withdraw from the Paris Agreement, then-California Governor Jerry

Brown met in Beijing with China's President Xi Jinping to discuss climate change. *See* David Sloss, *California's Climate Diplomacy and Dormant Preemption*, 56 Washburn L.J. 507, 507 (2017). President Xi reportedly "welcomed California's efforts to work with the Chinese government to help combat global warming." *Id.; see also* 4-ER-845–49; 6-ER-1311. Subsequently, and for the explicit reason of showing its disagreement with the federal government's decision to withdraw from the Paris Agreement, 6-ER-1306; 8-ER-1759, California and several other states formed the United States Climate Alliance, committing to reducing greenhouse gas emissions consistent with the Paris Agreement and seeking to "accelerate climate policy efforts across North America, Canada, Mexico." U.S. Climate Alliance, https://www.usclimatealliance.org/international-cooperation.

California is party to some 72 bilateral and multilateral agreements with national and subnational foreign governments on climate policy alone, 6-ER-1295–1309, including 23 bilateral agreements with China, 6-ER-1296–1300. *See* Climate Change Partnerships, Working Across Agencies and Beyond Borders, https://www.energy.ca.gov/about/campaigns/international-cooperation/climate-change-partnerships. California also has entered three bilateral agreements with Canada or Canadian provinces, including most notably the Agreement with the provincial government of Quebec at issue here. 6-ER-1295.

### 1.    California's cap-and-trade program

In the Global Warming Solutions Act of 2006, also known as "AB 32," the California Legislature directed the state to "facilitate the development of integrated and cost-effective regional, national, and *international* greenhouse gas reduction programs."  Cal. Health & Safety Code § 38564 (emphasis added); *see also* 17 Cal. Code Regs. §§ 95940–95943.  That same year, Governor Schwarzenegger ordered the California Air Resource Board (CARB) to "collaborate with [designated others] to develop a comprehensive market-based compliance program with the goal of creating a program that permits trading with the *European Union*, the Regional Greenhouse Gas Initiative and other jurisdictions."  Cal. Exec. Order No. S-20-06 (Oct. 18, 2006) (emphasis added) (4-ER-865).

After studying various alternatives, CARB responded by developing a "cap-and-trade" system to place a cap on greenhouse gas emissions, grant some regulated parties "emission allowances" so that they are legally entitled to emit a limited quantity of greenhouse gases, and create a market that permits regulated parties to trade their emission allowances.  5-ER-927–28; 7-ER-1526.  Such a system allows covered entities that are able to reduce greenhouse gas emissions at a low cost to sell excess allowances to another covered entity for whom it would be more costly to reduce emissions.  *Id.*  As a starting point for developing such a system, California joined the Western Climate Initiative (WCI)—a coalition of

9

states and Canadian provinces interested in a regional greenhouse gas program—to negotiate the development of a cap-and-trade design that would meet the parties' needs. 3-ER-598–604; 6-ER-1390–1440; 7-ER-1441–1595.

After several years of negotiating with the states and provinces, CARB in 2011 adopted regulations creating a cap-and-trade system based on WCI's designs. *See* 17 Cal. Code Regs. §§ 95801–96022; *see also* 8-ER-1760–63 (providing more information about the workings of the cap-and-trade system).

## 2. California's linkage with Quebec

Around the time of its cap-and-trade system's adoption in 2011, California began negotiating with Quebec certain amendments to its regulations that would facilitate a linkage between the two jurisdictions. In May 2012, after many months of negotiations, California published its initial statement of reasons for proposed amendments to effectuate a linkage with Quebec. The statement recognized that, "[i]n order . . . to implement a joint market program, there are key mechanisms in the two programs *that must be identical*." 5-ER-951 (emphasis added). CARB offered dozens of amendments to harmonize the parties' regulations. 5-ER-1035–1130. Consistent with its desire to harmonize the essential functions of the cap-and-trade systems, CARB emphasized that small changes—even just changes to the parties' reporting and verification rules—could undermine the equivalence that is necessary for the joint market to function. 5-ER-940–43, 951. In addition to a

10

commitment to collaborative management, California acknowledged that both parties must maintain certain standards to ensure that one ton of emissions as measured and monitored in California equals one ton of emissions as measured and monitored in Quebec. *See* 5-ER-939 (discussing how linked programs must be substantially similar in scope and stringency for the link to work).

California thus enacted SB 1018. This statute ensured that California would link only with governments with sufficiently parallel regulatory requirements. It provides that CARB may not link to another program "unless [CARB] notifies the Governor that [it] intends to take such action and the Governor, acting in his or her independent capacity, makes [four] findings." Cal. Gov't Code § 12894(f). One of those findings is that the "jurisdiction with which the state agency proposes to link has adopted program requirements for greenhouse gas reductions . . . that are *equivalent to or stricter* than those required" by California itself. *Id.* (emphasis added). CARB obtained the Governor's finding that the Quebec program was equally or more stringent than the California cap-and-trade program in April 2013. 5-ER-1155–56.

In September 2013, California and Quebec then signed the Cap-and-Trade Linkage Agreement. The two parties pledged "to work jointly and collaboratively toward the harmonization and integration of [their] mandatory greenhouse gas emissions reporting programs and cap-and-trade programs for reducing greenhouse

11

gas emissions." 3-ER-491-505. The Agreement obligated the parties to "consult each other regularly" and to "continue to examine their respective . . . [regulations] to promote continued harmonization and integration." 3-ER-497 (Arts. 3-4).

The Agreement also provided that "auctioning of emission allowances and emission units by the Parties' respective programs shall occur jointly." 3-ER-499 (Art. 8). Covered entities in California were granted authority to trade emission allowances with covered entities in Quebec, and vice-versa, "as provided for under their respective cap-and-trade program regulations." *Id.* (Art. 7). California agreed to accept compliance instruments issued by Quebec to satisfy compliance obligations in California, and Quebec correspondingly agreed to accept compliance instruments issued by California to satisfy compliance obligations in Quebec. *Id.* (Art. 6). The parties agreed to consult with each other before making changes to their respective offset protocols or changing procedures for issuing offset credits. 3-ER-498 (Art. 5). They also agreed to "continue coordinating administrative and technical support through the WCI, Inc., which was created to perform such tasks." 3-ER-500 (Art. 11).

The Agreement stipulated that it "does not modify any existing laws and regulations" of either party. 3-ER-502 (Art. 13). But California law required those laws and regulations to be aligned *prior* to the Agreement as a condition of entering into the Agreement. Cal. Gov't Code § 12894(f). The parties were permitted to

12

withdraw, but the Agreement required "12 months prior written notice to the other party" before withdrawal is legally effective. 3-ER-503 (Art. 16). Similarly, termination of the Agreement required "unanimous consent" of the parties, and termination is not legally effective until "12 months following such consent." 3-ER-505 (Art. 20). In the event of either withdrawal or termination, a party's "obligations under article 14 regarding confidentiality of information . . . continue to remain in effect." 3-ER-503 (Art. 16).

Four years later, California and Quebec terminated the original Agreement and entered into a nearly identical replacement Agreement that added Ontario as a party. This replacement made several changes to the Agreement's withdrawal and termination procedures. 8-ER-1796–1816. Specifically, the amendments removed the 12-months-prior-written-notice requirement and replaced it with the following: "A Party that intends to withdraw from this Agreement shall endeavor to give 12 months notice." 8-ER-1806. The termination procedures otherwise remained largely the same, including the requirement of unanimous consent. 8-ER-1808. Ontario withdrew from the Agreement in July 2018. 4-ER-725.

As of November 2020, twenty-five joint auctions for emissions allowances have taken place under the Agreement and its predecessor. *See* CARB, Auction Information, Summary of Auction Settlement Prices and Results, https://ww2.arb. ca.gov/our-work/programs/cap-and-trade-program/auction-information; *see also*

13

7-ER-1646–52 (Aug. 2019).  In joint auctions, allowances are sold in lots of 1000, divided to reflect California's and Quebec's relative contribution, 7-ER-1687, but allowance buyers do not know the exact mix of the allowances that they purchase, 4-ER-722; 8-ER-1731.  As of September 2020, California reported that it had received more than *thirteen billion* dollars in proceeds from the sale of allowances since 2012.  *See* CARB, Auction Information, Summary of Auction Proceeds, https://ww2.arb.ca.gov/our-work/programs/cap-and-trade-program/auction-information; *see also* 4-ER-703 (Sept. 2019).

### C.    Proceedings below

In October 2019, the United States filed a complaint in the Eastern District of California against the State of California, CARB, WCI, Inc., and several individual officers of those entities (collectively, "California").  In four causes of action, the United States claimed that the Agreement with Quebec and supporting California laws and agreements violate various provisions of the United States Constitution. 8-ER-1749–80.  Causes of Action 1 and 2 alleged violations of the Treaty and Compact Clauses of Article I, Section 10, respectively.  8-ER-1775–76.  Cause of Action 3 alleged violations of the Foreign Affairs Doctrine, which implicates (among other provisions) the Supremacy Clause of Article VI.  8-ER-1776–78. Finally, Cause of Action 4 alleged violations of the Foreign Commerce Clause of Article I, Section 8.  8-ER-1778–79.

### 1. Treaty and Compact Clause claims

The United States first moved for summary judgment on the Treaty and Compact Clause claims, which involved pure questions of law (the Foreign Affairs Doctrine and Foreign Commerce Clause claims theoretically could have required discovery). California filed a cross-motion for summary judgment on those same claims. The district court granted California's motion in March 2020. 1-ER-32–64.

The court observed that treaties are generally thought to be agreements "of a political character" such as "treaties of alliance for purposes of peace and war, mutual government, the cession of sovereignty, and general commercial privileges." 1-ER-53 (internal quotation marks omitted) (citing *Virginia v. Tennessee*, 148 U.S. 503, 519–20 (1893)). The court concluded that the Agreement falls outside these century-old examples, 1-ER-53-55, and consequently "does not represent a treaty within Article I of the Constitution," 1-ER-54.

The district court further concluded that the Linkage Agreement does not constitute an agreement or compact requiring the consent of Congress. 1-ER-54–64. In particular, the court held that the Agreement does not require congressional approval because it does not sufficiently encroach on federal sovereignty in the exclusive sphere of foreign relations. *Id.*

15

### 2. Foreign Affairs Preemption claim

After it had become clear that neither party would be seeking discovery, the United States voluntarily asked the district court to dismiss its Foreign Commerce Clause Claim—which the court did, 1-ER-9 at n.8—and then moved for summary judgment on the remaining Foreign Affairs Preemption claim. California also filed a cross-motion for summary judgment on this remaining claim.

In July 2020, the district court entered summary judgment for California and against the United States. 1-ER-31. The court recognized that the "Foreign Affairs Doctrine encompasses two related, but distinct doctrines: conflict preemption and field preemption." 1-ER-12 (internal quotation marks and omitted). But the court ruled that neither doctrine supported granting summary judgment to the United States. 1-ER-12–31.

As to conflict preemption, the district court rejected the United States' argument that the Agreement conflicted with express federal policy, namely, President Trump's decision to withdraw from the Paris Agreement. 1-ER-12–20. As to field preemption, the court agreed with the United States that the Agreement reaches outside of an area of "traditional state responsibility" by creating an international carbon market. 1-ER-22-25. But the court declined to declare the Agreement unlawful on this basis. Although required to draw factual inferences in favor of the United States, the court concluded that the United States failed to show

16

"concrete evidence" that the Agreement more than incidentally intrudes on the federal government's foreign affairs authority; consequently, the court granted summary judgment to California.  1-ER-25-31.

## SUMMARY OF ARGUMENT

1. California has a history of pursuing its own foreign affairs when it disagrees with the federal government's approach on the world stage.  And, as the Constitution requires, the Supreme Court and this Court have a practice of appropriately invalidating California's laws and actions that interfere in foreign affairs.  The Agreement and its supporting laws and agreements represent the State's latest attempt to interfere in foreign affairs, this time concerning global climate policy.  And this Agreement, too, must be invalidated.  It transcends any traditional state responsibility, and it interferes with the federal government's exclusive constitutional authority to make foreign policy for the Nation.

2. The Agreement also violates the Compact Clause.  By the admission of California's own governors, the Agreement with Quebec increases the political power of the State vis-à-vis the federal government in pursuit of an international climate policy that is different from that of the federal government, all without congressional consent.  Global environmental policy—like all foreign policy—is reserved exclusively for the federal government.  Because the Agreement pursues a global climate policy, at a minimum, it must be submitted to Congress for that

body's consent.  Legislative practice further confirms that the Agreement is of the kind requiring congressional consent under the Compact Clause.  Because California has never received consent for the Agreement, it is unconstitutional.

The district court's judgment in favor of California should be reversed.

## STANDARD OF REVIEW

This Court reviews the district court's summary judgment decision and its interpretation of the Constitution de novo.  *See L.F. v. Lake Washington School District #414*, 947 F.3d 621, 625 (9th Cir. 2020).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Here, the United States is entitled to judgment as a matter of law.  Certainly, there was no basis to grant summary judgment to California.

## ARGUMENT

## I.    The Agreement and supporting state laws and agreements are preempted under the Foreign Affairs Doctrine.

"Power over external affairs is not shared by the States; it is vested in the *national government exclusively*."  *United States v. Pink*, 315 U.S. 203, 233 (1942) (emphasis added); *see also Hines*, 312 U.S. at 63.  The Supremacy Clause also declares that federal law is the supreme law of the land.  *See* U.S Const. art. VI, para. 2; *see also Von Saher*, 592 F.3d at 961 ("Federal law's 'power' to preempt state law arises from the Supremacy Clause.").  Taken together, these strictures

undergird the Foreign Affairs Doctrine, which preempts state laws that intrude into the federal government's exclusive authority over foreign affairs.

"Foreign affairs preemption encompasses two related, but distinct, doctrines: conflict preemption and field preemption." *Movsesian*, 670 F.3d at 1071. "Under conflict preemption, a state law must yield when it conflicts with an express federal foreign policy." *Id.*[1] But there need not be an express conflict for state laws to be preempted. *Id.* at 1072. Because of the broad powers over foreign affairs that the Constitution confers on the federal government, if a state's action merely intrudes on the field of foreign affairs without addressing a traditional state responsibility, it is preempted. *Id.* Given that the United States need not take an affirmative position for state laws to be preempted under field preemption, this concept is often referred to as "dormant foreign affairs preemption." *Id.*

This Court applies a two-part dormant foreign affairs preemption test under which a state's action is preempted when the state "(1) has no serious claim to be addressing a traditional state responsibility and (2) intrudes on the federal government's foreign affairs power." *Id.* at 1074. As explained below, applying

---

[1] Although the United States made a conflict preemption argument in the district court, it is pressing only its field preemption argument in this Court to simplify matters. After all, conflict and field preemption arguments are "complementary." *Movsesian*, 670 F.3d at 1072 (quoting *Garamendi*, 539 U.S. at 419 n.11). For example, the argument that the United States must speak with one voice on matters of global climate policy gives rise to both field and conflict preemption.

this two-part test here demonstrates that the Agreement and its supporting laws and agreements are preempted. They collectively intrude on the field of foreign affairs without addressing a traditional state responsibility.

### A. The Agreement does not advance a traditional state responsibility.

On the first element of foreign affairs preemption, the district court correctly concluded that the Agreement does not address a traditional state responsibility. 1-ER-20–25. In a general sense, environmental regulation has been regarded as a traditional state responsibility exercising a state's police powers. *See Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000) ("Air pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state."). But global climate diplomacy—and the marketing of an *international* cap-and-trade program specifically—are not. They concern the exclusively federal domain of foreign affairs. Therefore, the district court correctly concluded that California's cap-and-trade program—which produced the Agreement —exceeds the traditional limits of the state's police power.

One of the explicit aims of the California program is to "facilitate the development of programs" with "other nations." 1-ER-22 (quoting Cal. Health & Safety Code § 38564). Problematically, this aim "invokes the exercise of power typically reserved to the federal government." *Id.* As the district court further noted, California's program "was created with the expressed intent to have 'far

reaching effects' including 'encouraging other . . . countries to act."  1-ER-25

(quoting Cal. Health & Safety Code § 38501(c)-(e)).  Thus, although California

claims that its program's linkage with Quebec furthers purely domestic interests

such as reducing the cost of compliance for in-state businesses, the plain text of its

cap-and-trade program's organic statutes readily demonstrates that the state is not

acting solely to further its own domestic interests.

Under this Court's precedent, the Court will not accept a state's self-serving

statements that its actions seek to advance a traditional state responsibility.  It must

instead look for the "real purpose" behind those actions.  *Von Saher*, 592 F.3d at

965; *Movsesian*, 670 F.3d at 1076-77.  The district court relied solely on statutory

text in finding that the "real purpose" behind California's linkage with Quebec

exceeds a traditional state responsibility.  Although that text alone is sufficient

here, there is compelling evidence beyond the text.  This includes statements from

California governors and others that California is seeking "as a nation state" to

forge a foreign policy that is different from that of the federal government.  *See*,

*e.g.*, 4-ER-838, 845–49, 851–56; 6-ER-1311–19, 1334, 1388.

By its own admission and by the totality of its actions, California has made

clear that it is pursuing its own foreign policy.  6-ER-1334.  And the Agreement is

simply one example among many of California's aspirations as a "nation-state."

6-ER-1388 (quoting Governor Schwarzenegger).  California readily admits that

21

it is party to 72 active bilateral and multilateral "agreements" with national and subnational foreign and domestic governments relating to environmental policy alone. 6-ER-1205, 1295-1309. California states frankly that the purpose of these agreements is "to strengthen the *global* response to the threat of climate change." Climate Change Partnerships, *supra* p. 8 (emphasis added); *see also* 4-ER-688; 6-ER-1205. In short, California's broad and elaborate diplomatic footprint supports the district court's findings based on the statutory and regulatory text of the cap-and-trade program and overwhelms any conceivable argument that the Agreement responds to any discrete, truly local interest.

Although the district court correctly concluded that California was outside of its traditional, domestic lane, the court nevertheless considered these statements to be mere "political hyperbole" and refused to consider them in much of its analysis. The court erroneously limited its review of a state law's "real purpose" to statutory text, legislative history, and official publications. 1-ER-20-21 n.14. Of course, it will be rare that a state would admit in such text, history, or publication that a state law's real purpose is to interfere in foreign policy. Particularly for constitutional violations, therefore, extrinsic and circumstantial evidence (the totality of the evidence) must be examined to provide context. *See Von Saher*, 592 F.3d at 965–84 (examining the totality of evidence to conclude that California law extended beyond areas of traditional state competence into foreign affairs); *Movsesian*, 670

22

F.3d at 1076–77 (same); *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901

(2019) (looking to the text *and context* of the law in question in a domestic law

preemption case). In *Von Saher*, for example, this Court did not limit itself to

statutory text, legislative history, and official publications. Rejecting the district

court's approach, this Court considered a memorandum from the governor to

discover that the law's "real purpose" was not limited to regulating the sale of art

in California but also included creating a friendly forum for litigating stolen art

claims "open to anyone in the world." 592 F.3d at 965.

What California is now attempting to do with its cap-and-trade program and

Agreement is analogous to what the State did in *Garamendi*, *Deutsch*, *Von Saher*,

and *Movsesian*. In fact, it is even more egregious: now California is engaged in

international relations and agreements, not merely acting unilaterally through its

own domestic legislation. For example, in *Von Saher*, California was dissatisfied

with the federal government's resolution of Holocaust restitution claims for stolen

art. 592 F.3d at 964–65. It therefore enacted a statute opening California courts to

anyone in the world to sue a museum or gallery located within or without the state.

*Id.* at 965. Likewise, in *Movsesian*, California was dissatisfied with the federal

government's inability to provide effective relief for the heirs of the Armenian

victims of the Ottoman Empire. 670 F.3d at 1075–76. The state therefore enacted

a statute vesting its own courts with jurisdiction over the heirs' life insurance claims

23

and extending the statute of limitations for such claims. *Id.* Although regulating property and insurance claims are traditional state responsibilities, this Court had no trouble recognizing that these state actions, specifically tied to events in foreign countries, extended beyond areas of traditional state competence and into foreign affairs. *See Von Saher*, 592 F.3d at 965–68; *Movsesian*, 670 F.3d at 1076–77; *Deutsch*, 324 F.3d at 715–16. Although these actions transgressed into the federal government's exclusive sphere of authority and were therefore properly struck down, at least they did not make an express agreement with a foreign jurisdiction.

In sum, the district court correctly concluded that California's Agreement and arrangements do not address a traditional area of state responsibility. The State has announced—through both its statutes and its actions—that because it is so dissatisfied with the federal government's foreign policy on climate issues, it has resolved to establish its own foreign policy in this sphere. And California has done so. Although environmental regulation may be—in some general sense—a traditional state responsibility, international climate diplomacy and the marketing of an international cap-and-trade program are not. This portion of the district court's decision was correct.

## B. The Agreement intrudes on foreign affairs.

Despite concluding that California was not advancing a traditional state responsibility through its Agreement, the district court declined to declare the

24

state's actions unconstitutional.  It did so after opining that there was no "concrete evidence" that the Agreement intrudes on foreign affairs.  1-ER-28.  Application of this standard was clear legal error:  "the pertinent inquiry is one of potential, rather than actual, impact upon federal supremacy."  *U.S. Steel Corp. v. Multistate Tax Commission*, 434 U.S. 452, 472 (1978).

Indeed, California's conduct here goes far beyond any the Supreme Court previously held preempted, where the State had enacted only domestic legislation or regulations.  Here, California entered into the Agreement and arrangements *with a foreign government* expressly *to achieve an international purpose* at variance to that of the federal government.  *See supra* pp. 20-22.  And now California is selling millions of dollars of emissions credits to covered entities in Quebec.  5-ER-1138 ("all else being equal, abatement under the linked system is more likely to occur in California, and Québec will be a net buyer").  The district court erred in failing to credit the obvious "potential" of this impact to foreign affairs and in requiring more concrete evidence of an "actual" conflict with foreign affairs.  Indeed, because California is not advancing a traditional state responsibility, its mere entry and operation in this field exclusively occupied by the federal government is preempted.  *See Garamendi*, 539 U.S. at 420 n.11 (state law is preempted under field preemption "[i]f a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility").

25

One of the express aims of California's program is for the state to be a global leader in reducing greenhouse gas emissions. *See* Cal. Health & Safety Code §§ 38501(c)-(e). California aims to be a global leader because the State (through its leaders, laws, and actions) has repeatedly expressed dissatisfaction with the federal government's approach to global climate issues. *See* 4-ER-838, 845–49, 851–56; 6-ER-1311–19, 1334, 1388; 8-ER-1758–59. Indeed, as it stands now under the district court's rationale requiring concrete evidence of an actual intrusion on foreign affairs, there is nothing preventing California—and every other state, for that matter—from entering into cap-and-trade agreements or other emissions agreements with China, India, Russia, and every other foreign power.

The district court's decision seemed to stem from a conclusion that, because California's express ambitions thus far have been tamed by the fact that only one foreign power (Quebec) has willingly joined California in its efforts, the Agreement is not sufficiently disrupting United States' foreign affairs. But the Supreme Court has invalidated far less expressly disruptive state entries into foreign affairs. *See, e.g., Zschernig*, 389 U.S. at 441 (finding that the "present Oregon law is not as gross an intrusion in the federal domain as those others might be," yet nevertheless preempting that law).

Notably, the district court did not specify just how many foreign powers California's ambitions must attract before its multinational program's impacts have

26

more than an incidental impact on this Nation's foreign affairs. And therein lies the flaw. California is not just taking local action that targets matters of foreign relations, as it did in *Garamendi*, *Duetsch*, *Von Saher*, and *Movsesian*. California is intentionally and directly entering into an agreement with a foreign power in an area of global concern in declared opposition to the foreign policy of the United States on that very issue of global concern. Even if California entirely fails in its attempted global ambitions beyond Quebec, and even if there are presently no concrete harms of the type the district court demanded, the State's measures are preempted: "foreign affairs and international relations" are "matters which the Constitution entrusts *solely* to the Federal Government." *Zschernig*, 389 U.S. at 436. The Agreement must be struck down.

The policy implications of sustaining California's Agreement are serious. If sanctioned by the federal court, this Agreement signifies to foreign nations that— if the federal government cannot or will not enter into international agreements on climate issues—foreign nations may bypass the federal government and enter into emissions agreements with various states and local governments. Indeed, even the district court recognized the "distinct possibility" that foreign powers would be motivated by the Agreement to negotiate with California to the exclusion of the federal government. 1-ER-29. But the court dismissed these policy concerns: where the area is one occupied by the federal government, and where the state

27

is not acting in an area of traditional state responsibility, that distinct "potential" alone should have been sufficient to preempt the Agreement. *See U.S. Steel*, 434 U.S. at 472.

The United States must speak with one voice on international climate policy. *See Garamendi*, 539 U.S. at 424 (invalidating California law that "compromise[s] the very capacity of the President to speak for the Nation with one voice in dealing with other governments"). In the last 20 years alone, the federal judiciary has been called on to invalidate multiple attempts by California to speak with its own voice on foreign affairs. *See id.* at 420–27; *Von Saher*, 592 F.3d at 966–68; *Deutsch*, 324 F.3d at 716; *Movsesian,* 670 F.3d at 1071–77. In so doing, the courts did not question the good intentions behind the policies that California sought to advance.

Thus, the State previously acted out of its declared dissatisfaction with the avenues for seeking relief offered by the federal government to the victims (or their heirs) of the Holocaust, of slave labor during World War II, and of what California called the Armenian genocide. The Supreme Court even suggested that, all other things being equal, California's aggressive iron-fist approach to these issues might be more effective in providing timely relief to victims than the kid-gloves approach favored by the federal government. *Garamendi*, 539 U.S. at 427. But the Supreme Court further recognized that in foreign relations, all other things are *not* equal. *Id.*

28

Regardless of "effectiveness," the United States must conduct its foreign relations holistically, with one voice.[2]

For these reasons, the Agreement necessarily intrudes on the federal government's ability to negotiate international agreements on climate policy, even without what the district court would call "concrete" evidence of a conflict. If California is permitted to maintain the Agreement, and make similar agreements with other foreign jurisdictions, "the President has less to offer and less economic and diplomatic leverage." *Garamendi*, 539 U.S. at 424 (quoting *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 377 (2000)). The United States is one of the world's largest emitters of greenhouse gases. *See Massachusetts v. EPA*, 549 U.S. at 524–25. It therefore has significant leverage in climate negotiations. Canada in particular could be a logical place for the federal government to turn for an ally to negotiate a more favorable agreement on climate change. This natural opportunity

---

[2] Relying on *Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151 (E.D. Cal. 2007), as it did below, California may argue that the Agreement interferes with the federal government's strategy, but not its policy. This is a distinction without a difference. *See Crosby*, 530 U.S. at 379 (holding that the "conflicts are not rendered irrelevant by the State's argument that there is no real conflict between the statutes because they share the same goals"). As explained in the text, the field of foreign affairs—including the policies themselves and the strategies to achieve those policies—is the "full and exclusive responsibility" of the federal government. *See Hines*, 312 U.S. at 63. To the extent that *Goldstene* departs from this principle, it is erroneous. Moreover, *Goldstene* concerned a suit brought by a company against a state regulation that the company argued had international implications. 529 F. Supp. 2d at 1186–87. By contrast here, the federal government has shown that California is directly engaged in its "exclusive" domain of foreign affairs.

is compromised, however, to the extent that California is permitted to slice off portions of Canada through its own side deals. For example, California could integrate links between jurisdictions in developing countries such as Brazil and jurisdictions in developed countries such as Quebec.[3] This logically reduces the leverage for the federal government in negotiating on behalf of the entire Nation. As explained in *Crosby*, a court "need not get into any general consideration of limits of state action affecting foreign affairs to realize that the President's maximum power to persuade rests on his capacity to bargain for the benefits of access to the entire national economy *without exception for enclaves fenced off willy-nilly by inconsistent political tactics*." 530 U.S at 381 (emphasis added). The federal government is fully entitled to wield "the coercive power of the national economy" as a tool of diplomacy. *Id.* at 377. California has sapped that coercive tool of its force.

In short, the Constitution (together with UNFCCC, the GPCA, and other statutes) gives the federal Executive Branch the responsibility for setting national policy on global climate issues. And in the Executive Branch's view, and as a

---

[3] Indeed, California also stands ready to adopt so-called "Reducing Emissions from Deforestation and forest Degradation (REDD) plans" with jurisdictions in developing nations. Those jurisdictions would set aside a "sink" or "reservoir" for the absorption of greenhouse gases that they would not otherwise set aside, and entities in developed jurisdictions would pay them to do so. *See* 3-ER-367, ¶ 142; *see also* 3-ER-606–15; 4-ER-616–78; 7-ER-1596–1645.

simple matter of logic, the Agreement intrudes on its ability to conduct foreign relations. The district court should have given "serious weight" to that view. *Cf. Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) ("[T]here is a strong argument that federal courts should give serious weight to the Executive Branch's view of [a] case's impact on foreign policy."). "The basic fact is that California seeks to use an iron fist where the President has consistently chosen kid gloves." *Garamendi*, 539 U.S. at 427. But there must be one voice for the United States in international relations on greenhouse gas emissions. Because the Agreement and its supporting laws and agreements are an attempt by California to speak with a different voice on the world stage in the field of foreign relations, they violate the Constitution. The district court's failure to so declare should be reversed.

## II. California's Agreement with Quebec and supporting state laws and agreements violate the Compact Clause.

The Compact Clause of the Constitution provides that "[n]o State shall, without the consent of Congress . . . enter into any Agreement or Compact with another State, or with a foreign Power." Art. I, § 10, cl. 3. "Read literally, the Compact Clause would require the States to obtain congressional approval before entering into any agreement among themselves, irrespective of form, subject, duration, or interest to the United States." *U.S. Steel*, 434 U.S. at 459. But the Supreme Court has rejected a literal reading of the Compact Clause in *Virginia v. Tennessee*, at least for domestic compacts between states. *See* 148 U.S. at 517–18

31

("[T]he terms 'compact' or 'agreement' in the constitution do not apply to every possible compact or agreement between one state and another.").[4]  The Supreme Court instead held in *Virginia* that the Compact Clause applies only to those interstate agreements or compacts that increase political power of states vis-à-vis the federal government.  *See id.* at 518–19.  In other words, the Compact Clause is directed towards any agreement or compact "tending to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United States."  *Id.* at 519.  Even so, "the pertinent inquiry is one of potential, rather than actual, impact upon federal supremacy."  *U.S. Steel*, 434 U.S. at 472.

In *U.S. Steel*, the Supreme Court considered three factors for assessing "whether the Compact enhances state power *quoad* the National Government": (1) whether a compact "authorize[s] the member States to exercise any powers they could not exercise in its absence"; (2) whether "each State retains complete freedom to adopt or reject the rules and regulations" created by the multistate entity; and (3) whether "each State is free to withdraw at any time."  *Id.* at 473.  Notably, the Court used the disjunctive to lay out these factors, connecting them

---

[4] As the district court recognized, 1-ER-59 n.13, the Supreme Court never has applied the *Virginia* test to an agreement or compact between a state and a *foreign* power.  Because the Agreement is plainly covered by the Compact Clause even under the *Virginia* test, this Court need not address whether a more demanding standard should be applied to compacts between a state and a foreign power (as the United States argued below).

with the word "nor." *Id.* Thus, only one of the three factors need apply for the Agreement to qualify as a "Compact" under *U.S. Steel*'s application of the *Virginia* test. As demonstrated below, however, all three factors apply here.

Moreover, the considerations that led to the Supreme Court's conclusion in *U.S. Steel* are not exclusive. *See, e.g., Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System*, 472 U.S. 159 (1985) (concluding the purported agreement did not require congressional consent under the *Virginia* test without analyzing the *U.S. Steel* factors). The ultimate test under *Virginia* is whether the agreement or compact requires congressional consent because it "encroach[es] upon or interfere[s] with the just supremacy of the United States." *See* 148 U.S. at 519. Many considerations are relevant to that inquiry. The fact that the Agreement is with a foreign power, and thus that California is acting in a way that could affect foreign affairs—an area of exclusive federal sovereignty—is one consideration. Congressional intent and historical practice are also important considerations. Namely, the Clean Air Act demonstrates that the Agreement is of a kind requiring congressional consent, and congressional consent historically has been required for agreements with foreign powers of even less significance than the Agreement between California and Quebec. All of these crucial considerations are discussed below.

33

A. **The Agreement requires congressional approval because it interferes with the just supremacy of the United States.**

1. **The Agreement exceeds California's powers, encroaching on those of the federal government.**

Taking each *U.S. Steel* factor in turn, the first asks whether the agreement "authorize[s] the member States to exercise any powers they could not exercise in its absence." 434 U.S. at 473. By acting outside a traditional state responsibility and implicating a matter of truly global scale, the Agreement requires congressional approval because it enables the State to exercise a power over foreign affairs that it cannot otherwise exercise. Unlike when states enter into domestic compacts among themselves concerning domestic issues, "foreign affairs and international relations" are "matters which the Constitution entrusts solely to the Federal Government." *Zschernig*, 389 U.S. at 436; *see also Hines*, 312 U.S. at 63 (foreign affairs is the "full and exclusive responsibility" of the federal government). Consequently, and almost by definition, an agreement or compact between a state and a foreign power that deals with a non-local issue (here, a truly global issue) increases the political power of states vis-a-vis the federal government and requires congressional consent.

The Supreme Court first addressed the Compact Clause in *Holmes v. Jennison*, 39 U.S. (14 Pet.) 540 (1840). The petitioner challenged Vermont's effort to extradite him to Canada—a foreign power—to face murder charges. *Id.* at 540–42 (reporter's summary). At the time, the United States lacked an extradition treaty

with Canada, and the Secretary of State had instructed the Governor of Vermont

not to comply with Canada's request for extradition. *Id.* The Governor had

nonetheless agreed to turn the petitioner over to Canadian authorities. *Id.* An

equally divided Court (one Justice was absent) dismissed the writ of error for lack

of jurisdiction. *Id.* at 579 (opinion of Taney, C.J.). But writing for himself and

three others, Chief Justice Taney took the view that a State lacks any inherent

authority to enter into extradition arrangements with a foreign country. The power

to make such arrangements, he observed, "is one of the powers that the states are

forbidden to exercise without the consent of Congress under the Compact Clause."

*Id.* at 570. According to the Chief Justice,

> it was the intention of the framers of the Constitution to use the
> broadest and most comprehensive terms; and that they anxiously
> desired to cut off *all* connection or communication between a state
> and a foreign power: and we shall fail to execute that evident
> intention, unless we give to the word "agreement" its most extended
> signification; and so apply it as to *prohibit every* agreement, written
> or verbal, formal or informal, positive or implied, by the mutual
> understanding of the parties.

*Id.* at 572 (opinion of Taney, C.J.) (emphasis added).[5]

---

[5] On the basis of the views of a fifth justice (Justice Catron)—who concluded the
Supreme Court lacked jurisdiction but who also thought that the agreement was
prohibited by the Constitution—the Vermont Supreme Court later held that the
Governor's agreement violated the Constitution. *See Ex parte Holmes*, 12 Vt. 631,
641–42 (1840). It should be further noted that Chief Justice Taney's plurality
opinion historically has been treated as authoritative both by the Supreme Court
and the Attorney General. *See United States v. Rauscher*, 119 U.S. 407, 414
(1886) ("[T]here can be little doubt of the soundness of the opinion of Chief

Later in the nineteenth century, in *Virginia v. Tennessee*, the Court again recognized the broad applicability of the terms "agreement" and "compact." 148 U.S at 517–18 ("The terms 'agreement' or 'compact,' taken by themselves, are sufficiently comprehensive to embrace all forms of stipulation, written or verbal, and relating to all kinds of subjects . . . ."). But the Court simultaneously recognized a category of compacts or agreements that do not require congressional consent because of their local nature. *See id.* at 518–19. The Court provided a list of four examples of the kind of intensely *local cooperation* between states that would not implicate the Compact Clause. Not one comes close to California's integrated cap-and-trade agreement with a foreign sovereign:

> *If, for instance, Virginia should come into possession and ownership of a small parcel of land in New York which the latter* [S]*tate might desire to acquire as a site for a public building*, it would hardly be deemed essential for the latter [S]tate to obtain the consent of Congress before it could make a valid agreement with Virginia for the purchase of the land.

*Id.* at 518 (emphasis added).

---

Justice Taney, that the power exercised by the governor of Vermont is a part of the foreign intercourse of this country, which has undoubtedly been conferred upon the federal government; and that it is clearly included in the treaty-making power, and the corresponding power of appointing and receiving ambassadors and other public ministers."); 3 Op. Att'y Gen. 661 (1841) ("[F]rom the whole argument of the bench in the case of *Holmes vs. Jennison*, 14 Peters, 540, we may consider it as law: 1st. That no State can, without the consent of Congress, enter into any agreement or compact, express or implied, to deliver up fugitives from justice from a foreign State who may be found within its limits."); 27 Op. Att'y Gen. 327, 332 (1909) (The Compact Clause "prohibits a State from making *any* kind of an agreement with a foreign power." (emphasis added; citing *Holmes*, 39 U.S. (14 Pet.) at 574)).

> *If Massachusetts, in forwarding its exhibits to the World's Fair at Chicago, should desire to transport them a part of the distance over the Erie Canal*, it would hardly be deemed essential for that State to obtain the consent of [C]ongress before it could contract with New York for the transportation of the exhibits through that [S]tate in that way.

*Id.* (emphasis added).

> *If the bordering line of two States should cross some malarious and disease-producing district*, there could be no possible reason, on any conceivable public grounds, to obtain the consent of [C]ongress for the bordering [S]tates to agree to unite in draining the district, and thus removing the cause of disease.

*Id.* (emphasis added).

> *So, in case of threatened invasion of cholera, plague, or other causes of sickness and death*, it would be the height of absurdity to hold that the threatened [S]tates could not unite in providing means to prevent and repel the invasion of the pestilence without obtaining the consent of [C]ongress, which might not be at the time in session.

*Id.* (emphasis added).

The Supreme Court reasoned that each of these examples were inoffensive to federal sovereignty, because the states were exercising their police powers in traditional, entirely local ways to promote the health, safety, or welfare of their population. *See id.* at 518-19. All four examples fall far short of implicating the prerogatives of the United States. Among other reasons, none of the examples concerns an agreement with a foreign power or touch on issues of global concern.

Here, however, the Agreement is about as "local" as the United Nations. California and Quebec do not share a border. Indeed, at their closest point, they

are separated by approximately 2,500 miles. They are not, for example, pursuing suspects fleeing into each other's territory. In addressing global climate policy, they are not seeking to abate a nuisance that affects them in some entirely localized way, apart from every other state or Canadian province. Nor are they acting in emergency circumstances at a time when Congress is not in session. Indeed, the district court itself concluded that California was not acting pursuant to "traditional" powers. 1-ER-25.

The Agreement is thus entirely different in kind (not just degree) from those that have been held to be outside the reach of the Compact Clause. *See U.S. Steel*, 434 U.S. at 465 n.15 (reconciling *Virginia* with *Holmes* by explaining that *Holmes* dealt with an issue of foreign relations whereas *Virginia* considered a domestic matter); *see also id.* at 466 at n.18. Actually, California and Quebec are operating a massive, integrated regulatory apparatus that lacks a connection to any traditional local interest. 1-ER-20–25. California therefore must obtain Congress's consent.

Also relevant to the first *U.S. Steel* consideration is that the Agreement enables California to exercise power and influence over Quebec that it otherwise would not be able to exercise. California cannot credibly argue that, in the absence of the Agreement, it could compel Quebec—as one example among many—to "discuss[]" any proposed changes to its cap-and-trade program before adopting them. 8-ER-1801 (providing that, although a "Party may consider making changes

to its . . . program[]," "any proposed changes . . . *shall* be discussed between the Parties" (emphasis added)); *cf. International Paper Co. v. Ouellette*, 479 U.S. 481, 495 (1986) (precluding states from using their common law to "do indirectly what they could not do directly---regulate the conduct of out-of-state sources").

The Agreement also gives California control and influence over Quebec's program at the margins. The Linkage Agreement reflects minimum standards for the regulation of greenhouse gases with foreign powers. Before CARB may link to another program, the Governor must find the "jurisdiction has adopted program requirements for greenhouse gas reductions . . . that are equivalent to or stricter than those required" by California's legislature. Cal. Gov't Code § 12894(f). Thus, Quebec must now maintain standards equally stringent to those of California.

Moreover, a common market in compliance instruments necessarily requires cross-border regulation. In economic terms, this is known as Gresham's Law: if two jurisdictions share a market for compliance instruments and one jurisdiction were to lift its restrictions, then all instruments would flow to the jurisdiction that tried to hold the line. 3-ER-400, 430. This is because the credits would be unnecessary in the jurisdiction that lifted its restrictions, whereas the credits would remain valuable in the jurisdiction that tried to hold the line. This would result in a net increase in emissions in both places. *Parallel* restrictions are, therefore, the essence of cross-border regulation.

Because this cross-border emissions regulation transcends an international boundary, the Agreement encroaches on the supremacy of the United States. That requires the consent of Congress. The Supreme Court has opined that California gave up its right to enter into these sorts of agreements without congressional consent when it entered the Union. *Cf. Massachusetts*, 549 U.S. at 519 ("When a State enters the Union, it surrenders certain sovereign prerogatives"; e.g., "it cannot negotiate an emissions treaty with China or India.").

### 2. The Agreement limits California's powers to regulate.

The second *U.S. Steel* consideration asks whether "each State retains complete freedom to adopt or reject the rules and regulations" created by the multistate entity. *See* 434 U.S. at 473. While no factor is required or dispositive— particularly where, as here, we deal with a foreign compact entering the exclusive federal sphere of foreign relations—this consideration likewise weighs in favor of congressional consent. The Agreement is premised on the parties having already harmonized their regulatory schemes. So long as California remains a party to the Agreement, it is obliged to "discuss[]" with Quebec "any proposed changes" that it "may consider" to its program and "consult with" Quebec if a "difference between certain elements of the Parties' programs is identified." 8-ER-1800–01. This is not an example of "*complete freedom* to adopt or reject the rules and regulations of the [joint organization]." *U.S. Steel*, 434 U.S. at 473 (emphasis added). To be

40

sure, these "rules and regulations" may literally have their provenance in California, or in Quebec, or in WCI. But once they are adopted as the conforming principles of the Agreement, they acquire an obvious stickiness that California cannot disavow. Nor would it. In order for the covered entities that spend billions of dollars for California allowances to continue to have confidence in the system, California has contracted away some of its freedom of action—both practically and legally.

### 3. The Agreement and arrangements with Quebec limit California's ability to withdraw.

The third *U.S. Steel* consideration asks whether "each State is free to withdraw at any time." 434 U.S. at 473. Withdrawal from the Agreement is technically possible—although even then certain confidentiality requirements in Article 15 would continue to apply. This was seen in the case of Ontario. But it is not in fact practicable for California. Ontario comparatively had little skin in the game. Unlike for Ontario, withdrawal is not a credible option for California, given the billions of dollars in unused credits that remain outstanding, the covered entities' blindness as to whose allowances they hold, and the undertaking that both California and Quebec made to accept credits issued by either jurisdiction. 4-ER-703, 722.

As of September 2020, California reported that it had received more than *thirteen billion* dollars in proceeds from the sale of allowances since 2012. *See* CARB, Auction Information, Summary of Auction Proceeds, *supra* p. 14; *see also*

4-ER-703 (Sept. 2019). As for Quebec, its respective cap-and-trade program is too small, expensive, and concentrated in core industrial sectors to continue without linking to a larger jurisdiction. 5-ER-1138-42. By linking with California, Quebec lowered compliance costs for businesses in its jurisdiction by an estimated 52-59 percent (estimated at $387-532 million). *See* Mark Purdon, et al., *The Political Economy of California and Québec's Cap-and-Trade Systems* 36 (2014), https:// institute.smartprosperity.ca/sites/default/files/publications/files/QuebecCalifornia% 20FINAL.pdf. Accordingly, the Agreement is the impetus for a highly complex, interdependent relationship from which neither party can realistically withdraw. California and Quebec now hold joint auctions where buyers purchase tradeable allowances reflecting a mixture of allowances from the respective jurisdictions. 4-ER-763. Under the Agreement, the buyers may use those allowances to satisfy the program requirements of either jurisdiction until 2030. 4-ER-752; 8-ER-1801. The Agreement thus places both legal and practical limits on California's ability to end its integrated cap-and-trade program with Quebec. Entering a compact with these limit requires congressional consent.

### B. Legislative practice also shows that the Agreement is of the kind requiring congressional approval.

Even apart from the *Virginia* test and the *U.S. Steel* factors, legislative practice shows that California's Agreement with a foreign government is the kind of compact requiring congressional approval.

**1.    Through the Clean Air Act, Congress has determined that agreements for the control of air pollution require congressional consent.**

In the Clean Air Act, Congress already has acted to require congressional assent for multi-sovereign agreements addressing air pollution.  By statute then, not just by the Constitution, California must obtain congressional consent for its Agreement with Quebec.  The Act provides in relevant part:

> The consent of the Congress is hereby given to two or more States to negotiate and enter into agreements or compacts, not in conflict with any law or treaty of the United States, for (1) cooperative effort and mutual assistance for the prevention and control of air pollution and the enforcement of their respective laws relating thereto, and (2) the establishment of such agencies, joint or otherwise, as they may deem desirable for making effective such agreements or compacts. *No such agreement or compact shall be binding or obligatory upon any State a party thereto unless and until it has been approved by Congress.*

*See* 42 U.S.C. § 7402(c) (emphasis added).  Thus, the Act indicates that two or more states may enter into a binding agreement or compact for the control of air pollution—but *only* with congressional approval.

Even if the district court were correct that the quoted provision does not categorically bar states from entering into agreements or compacts concerning air pollution with foreign powers, 1-ER-64, the Clean Air Act nonetheless establishes that multi-sovereign agreements or compacts concerning air pollution are the *kinds* of agreements or compacts requiring congressional consent as a constitutional matter.  That the Agreement is with a foreign power (instead of a state) provides

43

even stronger reasoning for requiring California to obtain the consent of Congress. If California must garner such consent to enter into a compact for the control of air pollution with Oregon, it must obtain approval for such a compact with Quebec. But in violation of both constitutional and statutory law, California has not done so.

### 2. Historic practice further demonstrates that the Agreement must be congressionally approved.

The historic practice of Congress also supports the conclusion that the Agreement runs afoul of the Compact Clause. That is to say, Congress has often addressed itself to compacts between states and provinces of Canada, many far less momentous, and far more local in nature, than the Agreement at issue here. *See generally* Duncan B. Hollis, *The Elusive Foreign Compact*, 73 Mo. L. Rev. 1071, 1076 (2008) ("Congress has consented to foreign compacts in only four narrowly defined categories: (a) bridges; (b) fire fighting; (c) highways; and (d) emergency management."). In 1949, for example, Congress gave preliminary consent to the Northeastern Interstate Forest Fire Protection Compact. *See* Act of June 25, 1949, ch. 246, 63 Stat. 271, 272 ("Subject to the consent of the Congress of the United States, any province of the Dominion of Canada which is contiguous with any member state may become a party to this compact by taking such action as its laws and the laws of the Dominion of Canada may prescribe for ratification.").

Similarly, it approved a compact for the construction of a highway between Minnesota and Manitoba in 1958. *See* Act of Sept. 2, 1958, Pub. L. No. 85-877,

§ 1, 72 Stat. 1701, 1701.  In 2007, Congress approved the International Emergency

Management Assistance Memorandum of Understanding, which provides a structure

for northeastern states and nearby Canadian provinces to anticipate and respond to

disasters and other emergencies.  *See* S.J. Res. 13, Pub. L. No. 110-171, 121 Stat.

2467 (2007); *see also* International Bridge Act, 33 U.S.C. § 535a (preliminary

consent to agreements between states and Canadian and Mexican governmental

units on an issue of local concern, subject to approval by the Secretary of State).

Congress has also *declined* to approve the international aspects of a proposed

compact intended to protect the Great Lakes.  In 1956, the Department of State

testified against including Ontario and Quebec in a proposed Great Lakes Basin

Compact on the following grounds:

> As a matter of principle, the Department would oppose any interstate
> compact which affects foreign relations unless there is a showing of a
> specific local situation appropriate for handling by the local authorities.
> Here there is no such local situation.  The matter is of national interest,
> and clearly involves foreign relations . . . .  The proposal is for an
> international compact, not for an interstate compact.  This is not the
> sort of activity which was intended to be covered by the compact
> provision of the Constitution.  Matters of international negotiation
> and agreement should be under national control as the Constitution
> contemplates and requires.

The Great Lakes Basin Compact:  Hearing on S. 2688 Before the Subcomm. on the

Great Lakes Basin of the S. Comm. on Foreign Relations, 84th Cong., 2d Sess. 14,

17 (1956) (statement of Willard B. Cowles, Deputy Legal Adviser, Department of

State) (6-ER-1322, 1325).  Twelve years later, Congress provided its consent to the

Great Lakes Basin Compact, but only with respect to states and explicitly denying consent for the compact to include Canadian provinces as parties to the Compact. *See* Act of July 24, 1968, Pub. L. No. 90-419, 82 Stat. 414, 419. Congress's course of conduct and prior judgment that agreements with Canadian provinces require congressional approval should carry weight. *See Zivitovsky v. Kerry*, 576 U.S. 1, 23 (2015) ("In separation-of-powers cases this Court has often 'put significant weight upon historical practice.'" (emphasis deleted) (quoting *NLRB v. Noel Canning*, 573 U.S. 513 (2014))); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring) ("Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them."). Against this history, the Agreement has all the indicia of a binding compact subject to the Compact Clause.

### C. Congressional supervision is required to protect against the cumulative impacts of foreign compacts on the just supremacy of the United States.

Congressional supervision of the Agreement and others like it also is necessary, in part, because of California's position that it has unlimited authority to export its cap-and-trade system throughout the world. California offers no limiting principle. Thus, as already explained, there is under the district court's rationale nothing preventing California from entering into cap-and-trade agreements or other emissions agreements with China, India, Russia, and every other foreign power.

46

And every other state may do the same. Even if the district court were correct that an agreement with *one* foreign power has only a minimal impact on foreign affairs, at some juncture, the cumulative impacts of multiple agreements will reach a tipping point. The district court's analysis implies that it is the judiciary that will make that determination at the appropriate time.

But the Constitution is to the contrary. It instead vests that decision in *Congress* by requiring its prior consent for all agreements or compacts between a state and foreign power that may encroach or interfere in the just supremacy of the United States. *See* U.S. Const. art. I, § 10, cl. 3; *see also Petty v. Tennessee-Missouri Bridge Commission*, 359 U.S. 275, 282 n.7 (1959) ("[*O*]*nly* Congress is the appropriate organ for determining what arrangements between States might fall within the prohibited class of 'Treaty, Alliance, or Confederation', and what arrangements come within the permissive class of 'Agreement or Compact.' ") (emphasis added) (quoting Frankfurter & Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 Yale L.J. 685, 694–95 (1925)))). Almost by definition, congressional approval should be sought in the case of a foreign compact on a non-local issue, as the Constitution "requires that federal power in the field affecting foreign relations be left *entirely* free from local interference." *Hines*, 312 U.S. at 63 (emphasis added). The Agreement here is just such a compact, and so it is unconstitutional for this reason alone.

### D. The Agreement is an agreement or compact.

Finally, the district court questioned whether California and Quebec have entered into an "agreement" or "compact" at all. On this point, the court cited the Supreme Court's discussion in *Northeast Bancorp*. 1-ER-56–58. Short work can be made of that question. Undoubtedly, California and Quebec have entered into an actual written agreement, 8-ER-1796–1816, signed by representatives of both jurisdictions, 8-ER-1809. It is undisputed that that agreement is being carried out by both parties under its plain terms.

In *Northeast Bancorp*, by contrast, the plaintiffs contended that two States had *implicitly* entered into an agreement. There was no actual written agreement, as here. The states instead enacted parallel statutes that together had the effect of excluding non-resident corporations from engaging in certain banking practices in New England. *See* 472 U.S. at 175. The Court observed that the States' parallel conduct lacked "several of the classic indicia of a compact," such as constraints on each party's ability to "modify or repeal its laws unilaterally." *Id.* Yet the Court proceeded to assume that an agreement existed, ultimately concluding that it did not require congressional consent. *Id.* at 175-76.

*Northeast Bancorp* has no salience here. California and Quebec manifestly entered into an actual written agreement, with all of the formalities typical of an agreement between sovereigns. *See* 4-ER-868 (State Department memorandum

48

opining that a memorandum of understanding between a State and a Canadian province was likely intended to be a binding agreement where it "is structured as an agreement with a title, preamble, specific commitments and a signature block," and it uses terminology like "agree" and "ensure").

Moreover, the Agreement easily satisfies the classic indicia of a domestic compact identified in *Northeast Bancorp*: (1) establishment of a joint organization; (2) mutually dependent action; (3) restriction on unilateral modification or repeal of operative laws; and (4) reciprocal limitations. 472 U.S. at 175. Not only do the parties jointly rely on WCI for technical support, but they also establishes a "Consultation Committee" to "resolve . . . differences" between them. 8-ER-1804. As discussed above, moreover, the Agreement requires the parties to conform their programs to the point where they are knitted into a virtually seamless regulatory apparatus. 8-ER-1800–01 (requiring the parties to "continue to examine their respective regulations . . . to promote continued harmonization and integration of [their] programs"; and to take certain steps "where a difference between certain elements of the Parties' programs is identified"); *id.* (providing that although a "Party may consider making changes to its . . . program[]," "any proposed changes or additions shall be discussed between the Parties") (emphasis added); 8-ER-1801 (imposing the same duty of consultation with respect to "any proposed changes" in the "offset components" of a program); *id.* (providing that "mutual recognition of

49

the Parties' compliance instruments shall occur"); *see also* 4-ER-711–18, 723, ¶¶ 49-54, 65.

The Agreement's nature is further confirmed by its financial and political enormity. The Agreement and its supporting laws and agreements are a political and financial boon for both jurisdictions. 5-ER-1138–42. As mentioned, they create a politically interdependent relationship between California and Quebec. California receives billions of dollars in revenue, while Quebec is able to grant regulatory relief to regulated entities within its jurisdiction.

Neither California nor Quebec may easily withdraw from this relationship. They hold joint auctions where buyers purchase a mixture of allowances from the respective jurisdictions. 4-ER-763. Buyers may use those allowances to satisfy the program requirements of either jurisdiction until 2030. 8-ER-1801; 4-ER-752. As one would expect for such a complex and interdependent system in which billions of dollars change hands, the Agreement is not written in hortatory language. Its mandatory terms are presumably intended to give the regulated community and secondary market some confidence in the linkage's stability. The Agreement, for example, employs the word "shall" more than fifty times and in a wide variety of contexts. 4-ER-756; 8-ER-1796–1808. Moreover, termination of the Agreement requires the unanimous consent of the parties and is not legally effective until "12 months after the last of the Parties has provided is consent to the other Parties."

50

8-ER-1808.[6]  In the event of either withdrawal or termination, a party's "obligations under article 15 regarding confidentiality of information . . . continue to remain in effect."  8-ER-1806.

In short, the political and financial enormity of the Agreement—as well as its text, operation, and forensic architecture—point to the conclusion that the Agreement is more than just a list of hortatory aspirations.  It is the kind of formal agreement with a foreign power that should, at minimum, receive congressional scrutiny to determine whether it is permissible at all.  It is unhealthy for the unity of the Union for a state to have such an important relationship with a foreign power.  When push comes to shove, will California's ties to Quebec affect how its leaders deal with a dispute between Canada and the United States or a dispute between Quebec and Maine?  Our Founders "desired to cut off all connection or communication between a state and a foreign power" so that this kind of question need not even be asked.  *Holmes*, 39 U.S. at 572 (Taney, C.J.).

In sum, because California has not even sought—let alone received— congressional approval for the Agreement, the Agreement is unconstitutional.

---

[6] The termination provision is separate from the withdrawal provision.  Under the 2017 Agreement, a party must endeavor to provide 12 months' notice of its intent to withdraw from the Agreement.  8-ER-1806.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed and this matter should be remanded to the district court with instructions to enter judgment in favor of the United States.

Respectfully submitted,

s/ *Allen M. Brabender*

JEFFREY BOSSERT CLARK
*Assistant Attorney General*
JONATHAN D. BRIGHTBILL
ERIC GRANT
PAUL E. SALAMANCA
*Deputy Assistant Attorneys General*
STEVEN W. BARNETT
HUNTER J. KENDRICK
ALLEN M. BRABENDER
*Attorneys*

December 23, 2020          Environment and Natural Resources Division
DJ # 90-8-7-05141          U.S. Department of Justice

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**        20-16789

   I am the attorney or self-represented party.

   **This brief contains 12,276 words,** excluding the items exempted by Fed.

R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App.

P. 32(a)(5) and (6).

   I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P.
      29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because
      *(select only one)*:
      [ ] it is a joint brief submitted by separately represented parties;
      [ ] a party or parties are filing a single brief in response to multiple briefs; or
      [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**    s/ *Allen M. Brabender*

**Date**        December 23, 2020

# Addendum

# ADDENDUM

U.S. Const. art. I, § 10, cl. 3 (Compact Clause)........................................1a

U.S. Const. art. VI, para. 2 (Supremacy Clause) ....................................2a

Global Climate Protection Act of 1987, Pub. L. No. 100-204,
    §§ 1101–1106, 101 Stat. 1331, 1407–09 .......................................3a

International Bridge Act, 33 U.S.C. § 535a...........................................8a

Clean Air Act, 42 U.S.C. § 7402(c) .......................................................9a

Act of Jun. 25, 1949, ch. 246, 63 Stat. 271, 272...................................11a

Act of Sept. 2, 1958, Pub. L. No. 85-877, § 1, 72 Stat. 1701, 1701 ....................13a

Act of July 24, 1968, Pub. L. No. 90-419, 82 Stat. 414, 419 .............................14a

S.J. Res. 13, Pub. L. No. 110-171, 121 Stat. 2467 (2007)...................................16a

Cal. Gov't Code § 12894(f) ...................................................................22a

Cal. Health & Safety Code § 38501(c)-(e) ...........................................25a

Cal. Health & Safety Code § 38564.......................................................27a

17 Cal. Code Regs. §§ 95940–95943 ...................................................28a

# The Preamble

We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.

# Article I

## Section 10

No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress.

No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

## Article VI

All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation.

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

PUBLIC LAW 100–204—DEC. 22, 1987     101 STAT. 1407

(6) the PLO rededicated itself to the "continuing struggle in all its armed forms" at the Palestine National Council meeting in April 1987; and

(7) the Attorney General has stated that "various elements of the Palestine Liberation Organization and its allies and affiliates are in the thick of international terror".

(b) DETERMINATIONS.—Therefore, the Congress determines that the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law and should not benefit from operating in the United States.

### SEC. 1003. PROHIBITIONS REGARDING THE PLO.

22 USC 5202.

It shall be unlawful, if the purpose be to further the interests of the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof, on or after the effective date of this title—

(1) to receive anything of value except informational material from the PLO or any of its constituent groups, any successor thereto, or any agents thereof;

(2) to expend funds from the PLO or any of its constituent groups, any successor thereto, or any agents thereof; or

(3) notwithstanding any provision of law to the contrary, to establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof.

### SEC. 1004. ENFORCEMENT.

22 USC 5203.

(a) ATTORNEY GENERAL.—The Attorney General shall take the necessary steps and institute the necessary legal action to effectuate the policies and provisions of this title.

(b) RELIEF.—Any district court of the United States for a district in which a violation of this title occurs shall have authority, upon petition of relief by the Attorney General, to grant injunctive and such other equitable relief as it shall deem necessary to enforce the provisions of this title.

Courts, U.S.

### SEC. 1005. EFFECTIVE DATE.

22 USC 5201 note.

(a) EFFECTIVE DATE.—Provisions of this title shall take effect 90 days after the date of enactment of this Act.

(b) TERMINATION.—The provisions of this title shall cease to have effect if the President certifies in writing to the President pro tempore of the Senate and the Speaker of the House that the Palestine Liberation Organization, its agents, or constituent groups thereof no longer practice or support terrorist actions anywhere in the world.

# TITLE XI—GLOBAL CLIMATE PROTECTION

Global Climate Protection Act of 1987. Environmental protection. Pollution. 15 USC 2901 note.

### SEC. 1101. SHORT TITLE.

This title may be cited as the "Global Climate Protection Act of 1987".

**3a**

101 STAT. 1408        PUBLIC LAW 100–204—DEC. 22, 1987

15 USC 2901
note.

**SEC. 1102. FINDINGS.**

The Congress finds as follows:

(1) There exists evidence that manmade pollution—the release of carbon dioxide, chlorofluorocarbons, methane, and other trace gases into the atmosphere—may be producing a long-term and substantial increase in the average temperature on Earth, a phenomenon known as global warming through the greenhouse effect.

(2) By early in the next century, an increase in Earth temperature could—

(A) so alter global weather patterns as to have an effect on existing agricultural production and on the habitability of large portions of the Earth; and

(B) cause thermal expansion of the oceans and partial melting of the polar ice caps and glaciers, resulting in rising sea levels.

(3) Important research into the problem of climate change is now being conducted by various United States Government and international agencies, and the continuation and intensification of those efforts will be crucial to the development of an effective United States response.

(4) While the consequences of the greenhouse effect may not be fully manifest until the next century, ongoing pollution and deforestation may be contributing now to an irreversible process. Necessary actions must be identified and implemented in time to protect the climate.

International
organizations.

(5) The global nature of this problem will require vigorous efforts to achieve international cooperation aimed at minimizing and responding to adverse climate change; such international cooperation will be greatly enhanced by United States leadership. A key step in international cooperation will be the meeting of the Governing Council of the United Nations Environment Program, scheduled for June 1989, which will seek to determine a direction for worldwide efforts to control global climate change.

(6) Effective United States leadership in the international arena will depend upon a coordinated national policy.

15 USC 2901
note.
International
agreements.
Research and
development.
Science and
technology.

**SEC. 1103. MANDATE FOR ACTION ON THE GLOBAL CLIMATE.**

(a) GOALS OF UNITED STATES POLICY.—United States policy should seek to—

(1) increase worldwide understanding of the greenhouse effect and its environmental and health consequences;

(2) foster cooperation among nations to develop more extensive and coordinated scientific research efforts with respect to the greenhouse effect;

(3) identify technologies and activities to limit mankind's adverse effect on the global climate by—

(A) slowing the rate of increase of concentrations of greenhouse gases in the atmosphere in the near term; and

(B) stabilizing or reducing atmospheric concentrations of greenhouse gases over the long term; and

(4) work toward multilateral agreements.

President of U.S.

(b) FORMULATION OF UNITED STATES POLICY.—The President, through the Environmental Protection Agency, shall be responsible for developing and proposing to Congress a coordinated national policy on global climate change. Such policy formulation shall con-

**4a**

PUBLIC LAW 100–204—DEC. 22, 1987          101 STAT. 1409

sider research findings of the Committee on Earth Sciences of the Federal Coordinating Council on Science and Engineering Technology, the National Academy of Sciences, the National Oceanic and Atmospheric Administration, the National Science Foundation, the National Aeronautic and Space Administration, the Department of Energy, the Environmental Protection Agency, and other organizations engaged in the conduct of scientific research.

(c) COORDINATION OF UNITED STATES POLICY IN THE INTERNATIONAL ARENA.—The Secretary of State shall be responsible to coordinate those aspects of United States policy requiring action through the channels of multilateral diplomacy, including the United Nations Environment Program and other international organizations. In the *President of U.S.* formulation of these elements of United States policy, the Secretary of State shall, under the direction of the President, work jointly with the Administrator of the Environmental Protection Agency and other United States agencies concerned with environmental protection, consistent with applicable Federal law.

**SEC. 1104. REPORT TO CONGRESS.**                                        *15 USC 2901 note.*

Not later than 24 months after the date of enactment of this Act, the Secretary of State and the Administrator of the Environmental Protection Agency shall jointly submit to all committees of jurisdiction in the Congress a report which shall include—

  (1) a summary analysis of current international scientific understanding of the greenhouse effect, including its environmental and health consequences;

  (2) an assessment of United States efforts to gain international cooperation in limiting global climate change; and

  (3) a description of the strategy by which the United States intends to seek further international cooperation to limit global climate change.

**SEC. 1105. INTERNATIONAL YEAR OF GLOBAL CLIMATE PROTECTION.**            *15 USC 2901 note.*

In order to focus international attention and concern on the problem of global warming, and to foster further work on multilateral treaties aimed at protecting the global climate, the Secretary of State shall undertake all necessary steps to promote, within the United Nations system, the early designation of an International Year of Global Climate Protection.

**SEC. 1106. CLIMATE  PROTECTION  AND  UNITED  STATES-SOVIET**            *Union of Soviet* 
**          RELATIONS.**                                                  *Socialist Republics.* 
                                                                         *15 USC 2901 note.*

In recognition of the respective leadership roles of the United States and the Soviet Union in the international arena, and of their joint role as the world's two major producers of atmospheric pollutants, the Congress urges that the President accord the problem of climate protection a high priority on the agenda of United States-Soviet relations.

# TITLE XII—REGIONAL FOREIGN RELATIONS MATTERS

## PART A—SOVIET UNION AND EASTERN EUROPE

**SEC. 1201. SOVIET BALLISTIC MISSILE TESTS NEAR HAWAII.**

(a) FINDINGS.—The Congress finds that—

PUBLIC LAW 103–199—DEC. 17, 1993          107 STAT. 2317

Public Law 103–199
103d Congress

## An Act

For reform in emerging new democracies and support and help for improved partner-
ship with Russia, Ukraine, and other new independent states of the former
Soviet Union.

Dec. 17, 1993
[H.R. 3000]

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,*

### SECTION 1. SHORT TITLES.

This Act may be cited as the "Act For Reform In Emerging
New Democracies and Support and Help for Improved Partnership
with Russia, Ukraine, and Other New Independent States" or as
the "FRIENDSHIP Act".

Act For Reform
In Emerging
New Democracies
and Support and
Help for
Improved
Partnership
with Russia,
Ukraine, and
Other New
Independent
States.
FRIENDSHIP
Act.
Foreign
relations.
22 USC 5801
note.

### SEC. 2. TABLE OF CONTENTS.

The table of contents for this Act is as follows:

Sec. 1. Short titles.
Sec. 2. Table of contents.
Sec. 3. Definition.

#### TITLE I—POLICY OF FRIENDSHIP AND COOPERATION

Sec. 101. Statement of purpose.
Sec. 102. Findings.
Sec. 103. Statutory provisions that have been applicable to the Soviet Union.

#### TITLE II—TRADE AND BUSINESS RELATIONS

Sec. 201. Policy under Export Administration Act.
Sec. 202. Representation of countries of Eastern Europe and the Independent
         States of the former Soviet Union in legal commercial transactions.
Sec. 203. Procedures regarding transfers of certain Department of Defense-funded
         items.
Sec. 204. Soviet slave labor.

#### TITLE III—CULTURAL, EDUCATIONAL, AND OTHER EXCHANGE PROGRAMS

Sec. 301. Mutual Educational and Cultural Exchange Act of 1961.
Sec. 302. Soviet-Eastern European research and training.
Sec. 303. Fascell Fellowship Act.
Sec. 304. Board for International Broadcasting Act.
Sec. 305. Scholarship programs for developing countries.
Sec. 306. Report on Soviet participants in certain exchange programs.

#### TITLE IV—ARMS CONTROL

Sec. 401. Arms Control and Disarmament Act.
Sec. 402. Arms Export Control Act.
Sec. 403. Annual reports on arms control matters.
Sec. 404. United States/Soviet direct communication link.

#### TITLE V—DIPLOMATIC RELATIONS

Sec. 501. Personnel levels and limitations.
Sec. 502. Other provisions related to operation of embassies and consulates.

107 STAT. 2318          PUBLIC LAW 103–199—DEC. 17, 1993

Sec. 503. Foreign Service Buildings Act.

### TITLE VI—OCEANS AND THE ENVIRONMENT

Sec. 601. Arctic Research and Policy Act.
Sec. 602. Fur seal management.
Sec. 603. Global climate protection.

### TITLE VII—REGIONAL AND GENERAL DIPLOMATIC ISSUES

Sec. 701. United Nations assessments.
Sec. 702. Soviet occupation of Afghanistan.
Sec. 703. Angola.
Sec. 704. Self determination of the people from the Baltic States.
Sec. 705. Obsolete references in Foreign Assistance Act.
Sec. 706. Review of United States policy toward the Soviet Union.

### TITLE VIII—INTERNAL SECURITY; WORLDWIDE COMMUNIST CONSPIRACY

Sec. 801. Civil defense.
Sec. 802. Report on Soviet press manipulation in the United States.
Sec. 803. Subversive Activities Control Act.
Sec. 804. Report on Soviet and international communist behavior.

### TITLE IX—MISCELLANEOUS

Sec. 901. Ballistic missile tests near Hawaii.
Sec. 902. Nondelivery of international mail.
Sec. 903. State-sponsored harassment of religious groups.
Sec. 904. Murder of Major Arthur Nicholson.
Sec. 905. Monument to honor victims of communism.

22 USC 5801 note.

**SEC. 3. DEFINITION.**

As used in this Act (including the amendments made by this Act), the terms "independent states of the former Soviet Union" and "independent states" have the meaning given those terms by section 3 of the Freedom for Russia and Emerging Eurasian Democracies and Open Markets Support Act of 1992 (22 U.S.C. 5801).

# TITLE I—POLICY OF FRIENDSHIP AND COOPERATION

22 USC 5801 note.

**SEC. 101. STATEMENT OF PURPOSE.**

The purpose of this Act is to amend or repeal numerous statutory provisions that restrict or otherwise impede normal relations between the United States and the Russian Federation, Ukraine, and the other independent states of the former Soviet Union. All of the statutory provisions amended or repealed by this Act were relevant and appropriate at the time of enactment, but with the end of the Cold War, they have become obsolete. It is not the purpose of this Act to rewrite or erase history, or to forget those who suffered in the past from the injustices or repression of communist regimes in the Soviet Union, but rather to update United States law to reflect changed international circumstances and to demonstrate for reformers and democrats in the independent states of the former Soviet Union the resolve of the people of the United States to support the process of democratic and economic reform and to conduct business with those states in a new spirit of friendship and cooperation.

22 USC 5801 note.

**SEC. 102. FINDINGS.**

The Congress finds and declares as follows:

(1) The Vancouver Declaration issued by President Clinton and President Yeltsin in April 1993 marked a new milestone in the development of the spirit of cooperation and partnership

**7a**

United States Code Annotated
   Title 33. Navigation and Navigable Waters (Refs & Annos)
      Chapter 11. Bridges over Navigable Waters (Refs & Annos)
         Subchapter IV. International Bridges

33 U.S.C.A. § 535a

§ 535a. Congressional consent to State agreements with Canada
and Mexico; Secretary of State's approval of agreements

Currentness

The consent of Congress is hereby granted for a State or a subdivision or instrumentality thereof to enter into agreements--

**(1)** with the Government of Canada, a Canadian Province, or a subdivision or instrumentality of either, in the case of a bridge connecting the United States and Canada, or

**(2)** with the Government of Mexico, a Mexican State, or a subdivision or instrumentality of either, in the case of a bridge connecting the United States and Mexico,

for the construction, operation, and maintenance of such bridge in accordance with the applicable provisions of this subchapter. The effectiveness of such agreement shall be conditioned on its approval by the Secretary of State.

### CREDIT(S)

(Pub.L. 92-434, § 3, Sept. 26, 1972, 86 Stat. 731.)

33 U.S.C.A. § 535a, 33 USCA § 535a
Current through P.L. 116-214.

End of Document        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**8a**

United States Code Annotated
   Title 42. The Public Health and Welfare
      Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
         Subchapter I. Programs and Activities
            Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7402

§ 7402. Cooperative activities

Currentness

**(a) Interstate cooperation; uniform State laws; State compacts**

The Administrator shall encourage cooperative activities by the States and local governments for the prevention and control of air pollution; encourage the enactment of improved and, so far as practicable in the light of varying conditions and needs, uniform State and local laws relating to the prevention and control of air pollution; and encourage the making of agreements and compacts between States for the prevention and control of air pollution.

**(b) Federal cooperation**

The Administrator shall cooperate with and encourage cooperative activities by all Federal departments and agencies having functions relating to the prevention and control of air pollution, so as to assure the utilization in the Federal air pollution control program of all appropriate and available facilities and resources within the Federal Government.

**(c) Consent of Congress to compacts**

The consent of the Congress is hereby given to two or more States to negotiate and enter into agreements or compacts, not in conflict with any law or treaty of the United States, for (1) cooperative effort and mutual assistance for the prevention and control of air pollution and the enforcement of their respective laws relating thereto, and (2) the establishment of such agencies, joint or otherwise, as they may deem desirable for making effective such agreements or compacts. No such agreement or compact shall be binding or obligatory upon any State a party thereto unless and until it has been approved by Congress. It is the intent of Congress that no agreement or compact entered into between States after November 21, 1967, which relates to the control and abatement of air pollution in an air quality control region, shall provide for participation by a State which is not included (in whole or in part) in such air quality control region.

**CREDIT(S)**

(July 14, 1955, c. 360, Title I, § 102, formerly § 2, as added Pub.L. 88-206, § 1, Dec. 17, 1963, 77 Stat. 393; renumbered § 102, Pub.L. 89-272, Title I, § 101(3), Oct. 20, 1965, 79 Stat. 992; amended Pub.L. 90-148, § 2, Nov. 21, 1967, 81 Stat. 485; Pub.L. 91-604, § 15(c)(2), Dec. 31, 1970, 84 Stat. 1713.)

42 U.S.C.A. § 7402, 42 USCA § 7402
Current through P.L. 116-214.

**9a**

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**10a**

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

63 STAT.]   81ST CONG., 1ST SESS.—CHS. 244–246—JUNE 24, 25, 1949                    **271**

"(f) The Register of Wills shall prepare, and make available, forms whereby the petition and final order under section 394 (b), and the petition, preliminary order, the statement, the final order, and the certificate of payment under section 394 (c), shall constitute in each case one connected instrument.  In lieu of all other fees, costs, or charges, the Register of Wills shall receive a fee of $5 for all services and work administered under this Act, including the taking of all affidavits, plus a fee of 25 cents for each certified copy of the aforesaid instruments.

"(g) The discovery of any additional property of the decedent, after the filing of a petition in either case provided for in this Act, shall be reported by the petitioner to the probate court as soon as discovered by him.  The existence of said additional property shall not invalidate any proceedings under this Act except when the additional property is discovered before the passage of the final order provided for, and either (1) is real estate or (2) increases the total value of the estate to more than $500, in which case no final order shall be passed under this Act and the court shall require regular administration.  Where additional property is discovered after passage of the final order, if said property is entirely personal and does not increase the value of the total estate to more than $500, then such additional property may be distributed pursuant to a new petition under the appropriate section of this Act; in all other cases such additional property may not be distributed under this Act.

"(h) Any person who makes a false affidavit under this Act, or who willfully violates any order of the probate court under this Act or any other provision of this Act, shall be liable to a fine of not exceeding $500 for each offense.

"(i) All Acts or parts of Acts inconsistent with the provisions of this Act shall be, and they are hereby, repealed to the extent of such inconsistency but only to such extent.

"(j) This Act shall apply to the estates of all persons dying after the date of the approval of this Act."

Approved June 24, 1949.

Forms.

Fee.

Additional property.

Penalty.

Applicability.

———

[CHAPTER 245]

AN ACT

To amend section 9 of the Act of May 22, 1928, as amended, authorizing and directing a national survey of forest resources.

June 25, 1949
[S. 979]
[Public Law 128]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That to enable the Secretary of Agriculture to complete and keep current the forest survey authorized by section 9 of the Act of May 22, 1928, as amended (45 Stat. 699, 702; 58 Stat. 265; 16 U. S. C. 581h), so that a continuous and comprehensive timber inventory will be maintained as part of the forest conservation program, said section is amended (1) by striking out "$750,000" and inserting "$1,000,000"; (2) by striking out "$6,500,000" and inserting "$11,000,000"; and (3) by striking out "$250,000" and inserting "$1,500,000".

Approved June 25, 1949.

National survey of forest resources.

———

[CHAPTER 246]

AN ACT

Granting the consent and approval of Congress to an interstate forest fire protection compact.

June 25, 1949
[S. 1669]
[Public Law 129]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the consent

Northeastern Interstate Forest Fire Protection Compact. Consent of Congress.

272            PUBLIC LAWS—CH. 246—JUNE 25, 1949      [63 Stat.

Canada.

and approval of Congress is hereby given to an interstate forest fire protection compact, as hereinafter set out; but before any province of the Dominion of Canada shall be made a party to such compact, the further consent of Congress shall first be obtained. Such compact reads as follows:

## NORTHEASTERN INTERSTATE FOREST FIRE PROTECTION COMPACT

### Article I

The purpose of this compact is to promote effective prevention and control of forest fires in the northeastern region of the United States and adjacent areas in Canada by the development of integrated forest fire plans, by the maintenance of adequate forest fire fighting services by the member states, by providing for mutual aid in fighting forest fires among the states of the region and for procedures that will facilitate such aid, and by the establishment of a central agency to coordinate the services of member states and perform such common services as member states may deem desirable.

### Article II

This agreement shall become operative immediately as to those states ratifying it whenever any two or more of the states of Maine, New Hampshire, Vermont, Rhode Island, Connecticut, New York and the Commonwealth of Massachusetts have ratified it and the Congress has given its consent. Any state not mentioned in this article which is contiguous with any member state may become a party to this compact. Subject to the consent of the Congress of the United States, any province of the Dominion of Canada which is contiguous with any member state may become a party to this compact by taking such action as its laws and the laws of the Dominion of Canada may prescribe for ratification. In this event, the term "state" in this compact shall include within its meaning the term "province" and the procedures prescribed shall be applied in the instance of such provinces, in accordance with the forms and practices of the Canadian Government.

### Article III

Each state joining herein shall appoint three representatives to a Commission hereby designated as the Northeastern Forest Fire Protection Commission. One shall be the State Forester or officer holding an equivalent position in such state who is responsible for forest fire control. The second shall be a member of the legislature of such state designated by the Commission or committee on interstate cooperation of such state, or if there be none, or if said Commission on interstate cooperation cannot constitutionally designate the said member, such legislator shall be designated by the governor thereof: provided that if it is constitutionally impossible to appoint a legislator as a Commissioner from such state, the second member shall be appointed by the governor of said state in his discretion. The third member shall be a person designated by the governor as the responsible representative of the governor. In the event that any province of the Dominion of Canada shall become a member of this Commission, it shall designate three members who will approximate this pattern of representation to the extent possible under the law and practices of such province. This Commission shall be a body corporate with the powers and duties set forth herein.

**12a**

Public Law 85-876

## AN ACT

To clarify the requirements with respect to the performance of labor imposed as a condition for the holding of mining claims on Federal lands pending the issuance of patents therefor.

September 2, 1958
[S. 2039]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the term "labor", as used in the third sentence of section 2324 of the Revised Statutes (30 U. S. C. 28), shall include, without being limited to, geological, geochemical and geophysical surveys conducted by qualified experts and verified by a detailed report filed in the county office in which the claim is located which sets forth fully (a) the location of the work performed in relation to the point of discovery and boundaries of the claim, (b) the nature, extent, and cost thereof, (c) the basic findings therefrom, and (d) the name, address, and professional background of the person or persons conducting the work. Such surveys, however, may not be applied as labor for more than two consecutive years or for more than a total of five years on any one mining claim, and each such survey shall be nonrepetitive of any previous survey on the same claim.

Mining claims, labor requirements.

Sec. 2. As used in this Act,

(a) The term "geological surveys" means surveys on the ground for mineral deposits by the proper application of the principles and techniques of the science of geology as they relate to the search for and discovery of mineral deposits;

Definitions.

(b) The term "geochemical surveys" means surveys on the ground for mineral deposits by the proper application of the principles and techniques of the science of chemistry as they relate to the search for and discovery of mineral deposits;

(c) The term "geophysical surveys" means surveys on the ground for mineral deposits through the employment of generally recognized equipment and methods for measuring physical differences between rock types or discontinuities in geological formations;

(d) The term "qualified expert" means an individual qualified by education or experience to conduct geological, geochemical or geophysical surveys, as the case may be.

Approved September 2, 1958.

Public Law 85-877

## AN ACT

To authorize the negotiation of a compact between the State of Minnesota and the Province of Manitoba, Canada, for the development of a highway to provide access to the northwest angle in such State.

September 2, 1958
[S. 3944]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the consent of Congress is hereby given to the State of Minnesota to negotiate and enter into a compact with the Province of Manitoba, Canada, for the development of a highway to provide access to the northwest angle in such State. Such compact shall not be binding or obligatory upon the State of Minnesota unless and until it has been ratified by such State and by the Province of Manitoba and approved by the Congress of the United States.

Compact, Minnesota and Canada.

Sec. 2. The right to alter, amend, or repeal this Act is expressly reserved.

Approved September 2, 1958.

414  PUBLIC LAW 90-419—JULY 24, 1968  [82 STAT.

Public Law 90-419

July 24, 1968
[S. 660]

AN ACT

Granting the consent of Congress to a Great Lakes Basin Compact, and for other purposes.

Great Lakes
Basin Compact.
Consent of
Congress.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the consent of Congress is hereby given, to the extent and subject to the conditions hereinafter set forth, to the Great Lakes Basin Compact which has been entered into by the States of Illinois, Indiana, Michigan, Minnesota, New York, Ohio, Pennsylvania and Wisconsin in the form as follows:

## "GREAT LAKES BASIN COMPACT

"The party states solemnly agree:

### "ARTICLE I

Purposes.

"The purposes of this compact are, through means of joint or cooperative action:

"1. To promote the orderly, integrated, and comprehensive development, use, and conservation of the water resources of the Great Lakes Basin (hereinafter called the Basin).

"2. To plan for the welfare and development of the water resources of the Basin as a whole as well as for those portions of the Basin which may have problems of special concern.

"3. To make it possible for the states of the Basin and their people to derive the maximum benefit from utilization of public works, in the form of navigational aids or otherwise, which may exist or which may be constructed from time to time.

"4. To advise in securing and maintaining a proper balance among industrial, commercial, agricultural, water supply, residential, recreational, and other legitimate uses of the water resources of the Basin.

"5. To establish and maintain an intergovernmental agency to the end that the purposes of this compact may be accomplished more effectively.

### "ARTICLE II

Effective date.

"A. This compact shall enter into force and become effective and binding when it has been enacted by the legislatures of any four of the States of Illinois, Indiana, Michigan, Minnesota, New York, Ohio, Pennsylvania, and Wisconsin and thereafter shall enter into force and become effective and binding as to any other of said states when enacted by the legislature thereof.

"B. The Province of Ontario and the Province of Quebec, or either of them, may become states party to this compact by taking such action as their laws and the laws of the Government of Canada may prescribe for adherence thereto. For the purpose of this compact the word 'state' shall be construed to include a Province of Canada.

"State."

**14a**

the applicability thereof to any state, agency, person or circumstance is held invalid, the constitutionality of the remainder of this compact and the applicability thereof to any state, agency, person or circumstance shall not be affected thereby, provided further that if this compact shall be held contrary to the constitution of the United States, or in the case of a Province, to the British North America Act of 1867 as amended, or of any party state, the compact shall remain in full force and effect as to the remaining states and in full force and effect as to the state affected as to all severable matters."

Sec. 2. The consent herein granted does not extend to paragraph B of article II or to paragraphs J, K, and M of article VI of the compact, or to other provisions of article VI of the compact which purport to authorize recommendations to, or cooperation with, any foreign or international governments, political subdivisions, agencies or bodies. In carrying out its functions under this Act the Commission shall be solely a consultative and recommendatory agency which will cooperate with the agencies of the United States. It shall furnish to the Congress and to the President, or to any official designated by the President, copies of its reports submitted to the party states pursuant to paragraph O of article IV of the compact.

*Report to Congress and President.*

Sec. 3. Nothing contained in this Act or in the compact consented to hereby shall be construed to affect the jurisdiction, powers, or prerogatives of any department, agency, or officer of the United States Government or of the Great Lakes Basin Committee established under title II of the Water Resources Planning Act, or of any international commission or agency over or in the Great Lakes Basin or any portion thereof, nor shall anything contained herein be construed to establish an international agency or to limit or affect in any way the exercise of the treatymaking power or any other power or right of the United States.

*79 Stat. 246.
42 USC 1962b-1962b-6.*

Sec. 4. The right to alter, amend, or repeal this Act is expressly reserved.

Approved July 24, 1968.

Public Law 90-420

July 24, 1968
[S. 1260]

AN ACT

To amend the Northwest Atlantic Fisheries Act of 1950 (Public Law 81-845).

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Northwest Atlantic Fisheries Act of 1950 (64 Stat. 1067; 16 U.S.C. 981–991) is amended as follows:

*Northwest Atlantic Fisheries Act of 1950, amendment.
Definitions.
16 USC 981.
14 UST 924;
17 UST 635.
1 UST 477.*

(a) By changing the period in section 2(a) of the Act to a comma and adding the following words: "and amendments including the 1961 declaration of understanding and the 1963 protocol, as well as the convention signed at Washington under date of February 8, 1949."

(b) By inserting the words "or mammal" after the word "fish" in section 2(g).

(c) By adding a new subsection (h) in section 2 of the Act to read as follows:

"(h) Fish: The word 'fish' means any species of fish, mollusks, crustaceans, including lobsters, and all forms of marine animal life covered by the convention."

(d) By deleting the words "outside of the United States" in section 4(b).

*16 USC 983.*

Approved July 24, 1968.

**15a**

PUBLIC LAW 110–171—DEC. 26, 2007          121 STAT. 2467

Public Law 110–171
110th Congress

Joint Resolution

Granting the consent of Congress to the International Emergency Management
Assistance Memorandum of Understanding.

Dec. 26, 2007
[S.J. Res. 13]

*Resolved by the Senate and House of Representatives of the
United States of America in Congress assembled,*

### SECTION 1. CONGRESSIONAL CONSENT.

State listing.
Provinces.

Congress consents to the International Emergency Management
Assistance Memorandum of Understanding entered into between
the States of Maine, New Hampshire, Vermont, Massachusetts,
Rhode Island, and Connecticut and the Provinces of Quebec, New
Brunswick, Prince Edward Island, Nova Scotia and Newfoundland.
The compact is substantially as follows:

### "Article I—International Emergency Management Assistance Memorandum of Understanding Purpose and Authorities

"The International Emergency Management Assistance Memo-
randum of Understanding, hereinafter referred to as the 'compact,'
is made and entered into by and among such of the jurisdictions
as shall enact or adopt this compact, hereinafter referred to as
'party jurisdictions.' For the purposes of this agreement, the term
'jurisdictions' may include any or all of the States of Maine, New
Hampshire, Vermont, Massachusetts, Rhode Island, and Con-
necticut and the Provinces of Quebec, New Brunswick, Prince
Edward Island, Nova Scotia and Newfoundland, and such other
states and provinces as may hereafter become a party to this
compact.

"The purpose of this compact is to provide for the possibility
of mutual assistance among the jurisdictions entering into this
compact in managing any emergency or disaster when the affected
jurisdiction or jurisdictions ask for assistance, whether arising from
natural disaster, technological hazard, manmade disaster or civil
emergency aspects of resources shortages.

"This compact also provides for the process of planning mecha-
nisms among the agencies responsible and for mutual cooperation,
including, if need be, emergency-related exercises, testing, or other
training activities using equipment and personnel simulating
performance of any aspect of the giving and receiving of aid by
party jurisdictions or subdivisions of party jurisdictions during
emergencies, with such actions occurring outside actual declared
emergency periods. Mutual assistance in this compact may include
the use of emergency forces by mutual agreement among party
jurisdictions.

**16a**

**"Article II—General Implementation**

"Each party jurisdiction entering into this compact recognizes that many emergencies may exceed the capabilities of a party jurisdiction and that intergovernmental cooperation is essential in such circumstances. Each jurisdiction further recognizes that there will be emergencies that may require immediate access and present procedures to apply outside resources to make a prompt and effective response to such an emergency because few, if any, individual jurisdictions have all the resources they need in all types of emergencies or the capability of delivering resources to areas where emergencies exist.

"The prompt, full, and effective utilization of resources of the participating jurisdictions, including any resources on hand or available from any other source that are essential to the safety, care, and welfare of the people in the event of any emergency or disaster, shall be the underlying principle on which all articles of this compact are understood.

"On behalf of the party jurisdictions participating in the compact, the legally designated official who is assigned responsibility for emergency management is responsible for formulation of the appropriate inter-jurisdictional mutual aid plans and procedures necessary to implement this compact, and for recommendations to the jurisdiction concerned with respect to the amendment of any statutes, regulations, or ordinances required for that purpose.

**"Article III—Party Jurisdiction Responsibilities**

"(a) FORMULATE PLANS AND PROGRAMS.—It is the responsibility of each party jurisdiction to formulate procedural plans and programs for inter-jurisdictional cooperation in the performance of the responsibilities listed in this section. In formulating and implementing such plans and programs the party jurisdictions, to the extent practical, shall—

"(1) review individual jurisdiction hazards analyses that are available and, to the extent reasonably possible, determine all those potential emergencies the party jurisdictions might jointly suffer, whether due to natural disaster, technological hazard, man-made disaster or emergency aspects of resource shortages;

"(2) initiate a process to review party jurisdictions' individual emergency plans and develop a plan that will determine the mechanism for the inter-jurisdictional cooperation;

"(3) develop inter-jurisdictional procedures to fill any identified gaps and to resolve any identified inconsistencies or overlaps in existing or developed plans;

"(4) assist in warning communities adjacent to or crossing jurisdictional boundaries;

"(5) protect and ensure delivery of services, medicines, water, food, energy and fuel, search and rescue, and critical lifeline equipment, services and resources, both human and material to the extent authorized by law;

"(6) inventory and agree upon procedures for the inter-jurisdictional loan and delivery of human and material resources, together with procedures for reimbursement or forgiveness; and

"(7) provide, to the extent authorized by law, for temporary suspension of any statutes or ordinances, over which the province or state has jurisdiction, that impede the implementation of the responsibilities described in this subsection.

"(b) REQUEST ASSISTANCE.—The authorized representative of a party jurisdiction may request assistance of another party jurisdiction by contacting the authorized representative of that jurisdiction. These provisions only apply to requests for assistance made by and to authorized representatives. Requests may be verbal or in writing. If verbal, the request must be confirmed in writing within 15 days of the verbal request. Requests must provide the following information:

"(1) A description of the emergency service function for which assistance is needed and of the mission or missions, including but not limited to fire services, emergency medical, transportation, communications, public works and engineering, building inspection, planning and information assistance, mass care, resource support, health and medical services, and search and rescue.

"(2) The amount and type of personnel, equipment, materials, and supplies needed and a reasonable estimate of the length of time they will be needed.

"(3) The specific place and time for staging of the assisting party's response and a point of contact at the location.

"(c) CONSULTATION AMONG PARTY JURISDICTION OFFICIALS.— There shall be frequent consultation among the party jurisdiction officials who have assigned emergency management responsibilities, such officials collectively known hereinafter as the International Emergency Management Group, and other appropriate representatives of the party jurisdictions with free exchange of information, plans, and resource records relating to emergency capabilities to the extent authorized by law.

## "Article IV—Limitation

"Any party jurisdiction requested to render mutual aid or conduct exercises and training for mutual aid shall undertake to respond as soon as possible, except that it is understood that the jurisdiction rendering aid may withhold or recall resources to the extent necessary to provide reasonable protection for that jurisdiction. Each party jurisdiction shall afford to the personnel of the emergency forces of any party jurisdiction, while operating within its jurisdictional limits under the terms and conditions of this compact and under the operational control of an officer of the requesting party, the same powers, duties, rights, privileges, and immunities as are afforded similar or like forces of the jurisdiction in which they are performing emergency services. Emergency forces continue under the command and control of their regular leaders, but the organizational units come under the operational control of the emergency services authorities of the jurisdiction receiving assistance. These conditions may be activated, as needed, by the jurisdiction that is to receive assistance or upon commencement of exercises or training for mutual aid and continue as long as the exercises or training for mutual aid are in progress, the emergency or disaster remains in effect or loaned resources remain in the receiving jurisdiction or jurisdictions, whichever is longer. The receiving jurisdiction is responsible for informing the assisting

**18a**

jurisdictions of the specific moment when services will no longer be required.

### "Article V—Licenses and Permits

"Whenever a person holds a license, certificate, or other permit issued by any jurisdiction party to the compact evidencing the meeting of qualifications for professional, mechanical, or other skills, and when such assistance is requested by the receiving party jurisdiction, such person is deemed to be licensed, certified, or permitted by the jurisdiction requesting assistance to render aid involving such skill to meet an emergency or disaster, subject to such limitations and conditions as the requesting jurisdiction prescribes by Executive order or otherwise.

### "Article VI—Liability

"Any person or entity of a party jurisdiction rendering aid in another jurisdiction pursuant to this compact are considered agents of the requesting jurisdiction for tort liability and immunity purposes. Any person or entity rendering aid in another jurisdiction pursuant to this compact are not liable on account of any act or omission in good faith on the part of such forces while so engaged or on account of the maintenance or use of any equipment or supplies in connection therewith. Good faith in this article does not include willful misconduct, gross negligence, or recklessness.

### "Article VII—Supplementary Agreements

"Because it is probable that the pattern and detail of the machinery for mutual aid among 2 or more jurisdictions may differ from that among the jurisdictions that are party to this compact, this compact contains elements of a broad base common to all jurisdictions, and nothing in this compact precludes any jurisdiction from entering into supplementary agreements with another jurisdiction or affects any other agreements already in force among jurisdictions. Supplementary agreements may include, but are not limited to, provisions for evacuation and reception of injured and other persons and the exchange of medical, fire, public utility, reconnaissance, welfare, transportation and communications personnel, equipment, and supplies.

### "Article VIII—Workers' Compensation and Death Benefits

"Each party jurisdiction shall provide, in accordance with its own laws, for the payment of workers' compensation and death benefits to injured members of the emergency forces of that jurisdiction and to representatives of deceased members of those forces if the members sustain injuries or are killed while rendering aid pursuant to this compact, in the same manner and on the same terms as if the injury or death were sustained within their own jurisdiction.

### "Article IX—Reimbursement

"Any party jurisdiction rendering aid in another jurisdiction pursuant to this compact shall, if requested, be reimbursed by the party jurisdiction receiving such aid for any loss or damage to, or expense incurred in, the operation of any equipment and the provision of any service in answering a request for aid and for the costs incurred in connection with those requests. An aiding party jurisdiction may assume in whole or in part any such loss,

**19a**

damage, expense, or other cost or may loan such equipment or donate such services to the receiving party jurisdiction without charge or cost. Any 2 or more party jurisdictions may enter into supplementary agreements establishing a different allocation of costs among those jurisdictions. Expenses under article VIII are not reimbursable under this section.

**"Article X—Evacuation**

"Each party jurisdiction shall initiate a process to prepare and maintain plans to facilitate the movement of and reception of evacuees into its territory or across its territory, according to its capabilities and powers. The party jurisdiction from which the evacuees came shall assume the ultimate responsibility for the support of the evacuees, and after the termination of the emergency or disaster, for the repatriation of such evacuees.

**"Article XI—Implementation**

"(a) This compact is effective upon its execution or adoption by any 2 jurisdictions, and is effective as to any other jurisdiction upon its execution or adoption thereby: subject to approval or authorization by the United States Congress, if required, and subject to enactment of provincial or State legislation that may be required for the effectiveness of the Memorandum of Understanding.

"(b) Any party jurisdiction may withdraw from this compact, but the withdrawal does not take effect until 30 days after the governor or premier of the withdrawing jurisdiction has given notice in writing of such withdrawal to the governors or premiers of all other party jurisdictions. The action does not relieve the withdrawing jurisdiction from obligations assumed under this compact prior to the effective date of withdrawal.

"(c) Duly authenticated copies of this compact in the French and English languages and of such supplementary agreements as may be entered into shall, at the time of their approval, be deposited with each of the party jurisdictions.

**"Article XII—Severability**

"This compact is construed to effectuate the purposes stated in Article I. If any provision of this compact is declared unconstitutional or the applicability of the compact to any person or circumstances is held invalid, the validity of the remainder of this compact and the applicability of the compact to other persons and circumstances are not affected.

**"Article XIII—Consistency of Language**

"The validity of the arrangements and agreements consented to in this compact shall not be affected by any insubstantial difference in form or language as may be adopted by the various states and provinces.

**"Article XIV—Amendment**

"This compact may be amended by agreement of the party jurisdictions.".

**SEC. 2. INCONSISTENCY OF LANGUAGE.**

The validity of the arrangements consented to by this Act shall not be affected by any insubstantial difference in their form or language as adopted by the States and provinces.

**20a**

121 STAT. 2472    PUBLIC LAW 110–171—DEC. 26, 2007

**SEC. 3. RIGHT TO ALTER, AMEND, OR REPEAL.**

The right to alter, amend, or repeal this Act is hereby expressly reserved.

Approved December 26, 2007.

LEGISLATIVE HISTORY—S.J. Res. 13:

CONGRESSIONAL RECORD, Vol. 153 (2007):
    Oct. 2, considered and passed Senate.
    Dec. 17, considered and passed House.

West's Annotated California Codes
    Government Code (Refs & Annos)
        Title 2. Government of the State of California
            Division 3. Executive Department (Refs & Annos)
                Part 2.5. Agencies (Refs & Annos)
                    Chapter 5. Greenhouse Gas Market-Based Compliance Mechanisms and Linkages to the State (Refs & Annos)

West's Ann.Cal.Gov.Code § 12894

§ 12894. Legislative findings and declarations; purpose; modification of California membership of Western Climate Initiative board of directors; notice of fund expenditures; reports to Legislature; linkages; issuance of findings by Governor

Effective: January 1, 2013
Currentness

(a)(1) The Legislature finds and declares that the establishment of nongovernmental entities, such as the Western Climate Initiative, Incorporated, and linkages with other states and countries by the State Air Resources Board or other state agencies for the purposes of implementing Division 25.5 (commencing with Section 38500) of the Health and Safety Code, should be done transparently and should be independently reviewed by the Attorney General for consistency with all applicable laws.

(2) The purpose of this section is to establish new oversight and transparency over any such linkages and related activities undertaken in relation to Division 25.5 (commencing with Section 38500) of the Health and Safety Code by the executive agencies in order to ensure consistency with applicable laws.

(b)(1) The California membership of the board of directors of the Western Climate Initiative, Incorporated, shall be modified as follows:

(A) One appointee or his or her designee who shall serve as an ex officio nonvoting member shall be appointed by the Senate Committee on Rules.

(B) One appointee or his or her designee who shall serve as an ex officio nonvoting member shall be appointed by the Speaker of the Assembly.

(C) The Chairperson of the State Air Resources Board or her or his designee.

(D) The Secretary for Environmental Protection or his or her designee.

(2) Sections 11120 through 11132 do not apply to the Western Climate Initiative, Incorporated, or to appointees specified in subparagraphs (C) and (D) of paragraph (1) when performing their duties under this section.

**22a**

(c) The State Air Resources Board shall provide notice to the Joint Legislative Budget Committee, consistent with that required for Department of Finance augmentation or reduction authorizations pursuant to subdivision (e) of Section 28.00 of the annual Budget Act, of any funds over one hundred fifty thousand dollars ($150,000) provided to the Western Climate Initiative, Incorporated, or its derivatives or subcontractors no later than 30 days prior to transfer or expenditure of these funds.

(d) The Chairperson of the State Air Resources Board and the Secretary for Environmental Protection, as the California voting representatives on the Western Climate Initiative, Incorporated, shall report every six months to the Joint Legislative Budget Committee on any actions proposed by the Western Climate Initiative, Incorporated, that affect California state government or entities located within the state.

(e) For purposes of this section, "link," "linkage," or "linking" means an action taken by the State Air Resources Board or any other state agency that will result in acceptance by the State of California of compliance instruments issued by any other governmental agency, including any state, province, or country, for purposes of demonstrating compliance with the market-based compliance mechanism established pursuant to Division 25.5 (commencing with Section 38500) of the Health and Safety Code and specified in Sections 95801 to 96022, inclusive, of Title 17 of the California Code of Regulations.

(f) A state agency, including, but not limited to, the State Air Resources Board, shall not link a market-based compliance mechanism established pursuant to Division 25.5 (commencing with Section 38500) of the Health and Safety Code and specified in Sections 95801 to 96022, inclusive, of Title 17 of the California Code of Regulations with any other state, province, or country unless the state agency notifies the Governor that the agency intends to take such action and the Governor, acting in his or her independent capacity, makes all of the following findings:

(1) The jurisdiction with which the state agency proposes to link has adopted program requirements for greenhouse gas reductions, including, but not limited to, requirements for offsets, that are equivalent to or stricter than those required by Division 25.5 (commencing with Section 38500) of the Health and Safety Code.

(2) Under the proposed linkage, the State of California is able to enforce Division 25.5 (commencing with Section 38500) of the Health and Safety Code and related statutes, against any entity subject to regulation under those statutes, and against any entity located within the linking jurisdiction to the maximum extent permitted under the United States and California Constitutions.

(3) The proposed linkage provides for enforcement of applicable laws by the state agency or by the linking jurisdiction of program requirements that are equivalent to or stricter than those required by Division 25.5 (commencing with Section 38500) of the Health and Safety Code.

(4) The proposed linkage and any related participation of the State of California in Western Climate Initiative, Incorporated, shall not impose any significant liability on the state or any state agency for any failure associated with the linkage.

(g) The Governor shall issue findings pursuant to subdivision (f) within 45 days of receiving a notice from a state agency, and shall provide those findings to the Legislature. The findings shall consider the advice of the Attorney General. The findings to be submitted to the Legislature shall not be unreasonably withheld. The findings shall not be subject to judicial review.

**23a**

**Credits**

(Added by Stats.2012, c. 39 (S.B.1018), § 22, eff. June 27, 2012. Amended by Stats.2012, c. 807 (A.B.1532), § 1.)

West's Ann. Cal. Gov. Code § 12894, CA GOVT § 12894

Current with all laws through Ch. 372 of 2020 Reg.Sess.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**24a**

---

West's Annotated California Codes
   Health and Safety Code (Refs & Annos)
      Division 25.5. California Global Warming Solutions Act of 2006 (Refs & Annos)
         Part 1. General Provisions (Refs & Annos)
            Chapter 2. Findings and Declarations (Refs & Annos)

West's Ann.Cal.Health & Safety Code § 38501

§ 38501. Legislative findings and declarations

Effective: July 25, 2017
Currentness

<Section operative until Jan. 1, 2031. See, also, § 38501 operative Jan. 1, 2031.>

The Legislature finds and declares all of the following:

(a) Global warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California. The potential adverse impacts of global warming include the exacerbation of air quality problems, a reduction in the quality and supply of water to the state from the Sierra snowpack, a rise in sea levels resulting in the displacement of thousands of coastal businesses and residences, damage to marine ecosystems and the natural environment, and an increase in the incidences of infectious diseases, asthma, and other human health-related problems.

(b) Global warming will have detrimental effects on some of California's largest industries, including agriculture, wine, tourism, skiing, recreational and commercial fishing, and forestry. It will also increase the strain on electricity supplies necessary to meet the demand for summer air-conditioning in the hottest parts of the state.

(c) California has long been a national and international leader on energy conservation and environmental stewardship efforts, including the areas of air quality protections, energy efficiency requirements, renewable energy standards, natural resource conservation, and greenhouse gas emission standards for passenger vehicles. The program established by this division will continue this tradition of environmental leadership by placing California at the forefront of national and international efforts to reduce emissions of greenhouse gases.

(d) National and international actions are necessary to fully address the issue of global warming. However, action taken by California to reduce emissions of greenhouse gases will have far-reaching effects by encouraging other states, the federal government, and other countries to act.

(e) By exercising a global leadership role, California will also position its economy, technology centers, financial institutions, and businesses to benefit from national and international efforts to reduce emissions of greenhouse gases. More importantly, investing in the development of innovative and pioneering technologies will assist California in achieving statewide greenhouse gas emissions targets established by this division and will provide an opportunity for the state to take a global economic and technological leadership role in reducing emissions of greenhouse gases.

**25a**

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    1

(f) It is the intent of the Legislature that the State Air Resources Board coordinate with state agencies, as well as consult with the environmental justice community, industry sectors, business groups, academic institutions, environmental organizations, and other stakeholders in implementing this division.

(g) It is the intent of the Legislature that the State Air Resources Board consult with the Public Utilities Commission in the development of emissions reduction measures, including limits on emissions of greenhouse gases applied to electricity and natural gas providers regulated by the Public Utilities Commission in order to ensure that electricity and natural gas providers are not required to meet duplicative or inconsistent regulatory requirements.

(h) It is the intent of the Legislature that the State Air Resources Board design emissions reduction measures to meet the statewide emissions limits for greenhouse gases established pursuant to this division in a manner that minimizes costs and maximizes benefits for California's economy, improves and modernizes California's energy infrastructure and maintains electric system reliability, maximizes additional environmental and economic cobenefits for California, and complements the state's efforts to improve air quality.

(i) It is the intent of the Legislature that the State Air Resources Board extend the market-based compliance mechanism adopted pursuant to subdivision (c) of Section 38562 from January 1, 2021, to December 31, 2030, inclusive, in a manner that effectively reduces greenhouse gas emissions; minimizes any adverse impacts on state consumers, businesses, and the economy; and continues elements of the current program that protect state utility ratepayers.

(j) It is the intent of the Legislature that the Climate Action Team established by the Governor to coordinate the efforts set forth under Executive Order S-3-05 continue its role in coordinating overall climate policy.

(k) This section shall remain in effect only until January 1, 2031, and as of that date is repealed.

**Credits**
(Added by Stats.2006, c. 488 (A.B.32), § 1. Amended by Stats.2017, c. 135 (A.B.398), § 1, eff. July 25, 2017.)

West's Ann. Cal. Health & Safety Code § 38501, CA HLTH & S § 38501
Current with all laws through Ch. 372 of 2020 Reg.Sess.

**26a**

West's Annotated California Codes
　　Health and Safety Code (Refs & Annos)
　　　Division 25.5. California Global Warming Solutions Act of 2006 (Refs & Annos)
　　　　Part 4. Greenhouse Gas Emissions Reductions (Refs & Annos)

West's Ann.Cal.Health & Safety Code § 38564

§ 38564. Consultation with other states, federal government, and other nations

Effective: January 1, 2007
Currentness

The state board shall consult with other states, and the federal government, and other nations to identify the most effective strategies and methods to reduce greenhouse gases, manage greenhouse gas control programs, and to facilitate the development of integrated and cost-effective regional, national, and international greenhouse gas reduction programs.

**Credits**

(Added by Stats.2006, c. 488 (A.B.32), § 1.)

West's Ann. Cal. Health & Safety Code § 38564, CA HLTH & S § 38564
Current with all laws through Ch. 372 of 2020 Reg.Sess.

**End of Document**　　　　　　　　　　　　© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**27a**

Barclays Official California Code of Regulations Currentness
    Title 17. Public Health
        Division 3. Air Resources
            Chapter 1. Air Resources Board
                Subchapter 10. Climate Change
                    Article 5. California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms
                    Subarticle 12. Linkage to External Greenhouse Gas Emissions Trading Systems (Refs & Annos)

17 CCR § 95940

§ 95940. General Requirements.

A compliance instrument issued by an external greenhouse gas emissions trading system (GHG ETS) may be used to meet the requirements of this Article if the external GHG ETS and the compliance instrument have been approved pursuant to this section and section 95941.

Note: Authority cited: Sections 38510, 38560, 38562, 38570, 38571, 38580, 39600 and 39601, Health and Safety Code. Reference: Sections 38530, 38560.5, 38564, 38565, 38570 and 39600, Health and Safety Code.

**HISTORY**

1. New subarticle 12 (sections 95940-95943) and section filed 12-13-2011; operative 1-1-2012 pursuant to Government Code section 11343.4 (Register 2011, No. 50).

This database is current through 12/4/20 Register 2020, No. 49

17 CCR § 95940, 17 CA ADC § 95940

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**28a**

Barclays Official California Code of Regulations Currentness
    Title 17. Public Health
        Division 3. Air Resources
            Chapter 1. Air Resources Board
                Subchapter 10. Climate Change
                    Article 5. California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms
                        Subarticle 12. Linkage to External Greenhouse Gas Emissions Trading Systems (Refs & Annos)

17 CCR § 95941

§ 95941. Procedures for Approval of External GHG ETS.

The Board may approve a linkage with an external GHG ETS after complying with relevant provisions of the Administrative Procedure Act (Government Code sections 11340 et seq.) and after the Governor of California has made the findings required by Government Code section 12894(f). Provisions set forth in this Article shall specify which compliance instruments issued by a linked GHG ETS may be used to meet a compliance obligation under this Article.

Note: Authority cited: Sections 38510, 38560, 38562, 38570, 38571, 38580, 39600 and 39601, Health and Safety Code. Reference: Sections 38530, 38560.5, 38564, 38565, 38570 and 39600, Health and Safety Code; and Section 12894, Government Code.

**HISTORY**

1. New section filed 12-13-2011; operative 1-1-2012 pursuant to Government Code section 11343.4 (Register 2011, No. 50).

2. Amendment of section and Note filed 9-18-2017; operative 10-1-2017 pursuant to Government Code section 11343.4(b)(3) (Register 2017, No. 38).

This database is current through 12/4/20 Register 2020, No. 49

17 CCR § 95941, 17 CA ADC § 95941

End of Document        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**29a**

Barclays Official California Code of Regulations Currentness
Title 17. Public Health
Division 3. Air Resources
Chapter 1. Air Resources Board
Subchapter 10. Climate Change
Article 5. California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms
Subarticle 12. Linkage to External Greenhouse Gas Emissions Trading Systems (Refs & Annos)

17 CCR § 95942

§ 95942. Interchange of Compliance Instruments with Linked
External Greenhouse Gas Emissions Trading Systems.

(a) Once a linkage is approved, a compliance instrument issued by the approved external GHG ETS, as specified in this section, may be used to meet a compliance obligation under this Article.

(b) An allowance issued by an approved external GHG ETS and specified in this section is not subject to the quantitative usage limit specified in section 95854.

(c) An offset credit or sector-based credit issued by an external GHG ETS is subject to the quantitative usage limit specified in section 95854, when used to meet a compliance obligation under this Article.

(d) Once a linkage is approved, a compliance instrument issued by California may be used to meet a compliance obligation within the approved External GHG ETS.

(e) Once a linkage is approved, a compliance instrument issued by the linked jurisdiction may be used to meet a compliance obligation in California.

(f) The administrator of the approved External GHG ETS must agree to inform the Executive Officer of any of the serial numbers of California compliance instruments that the External GHG ETS accepts for compliance.

(g) The Executive Officer will agree to inform the appropriate official in the approved External GHG ETS of any of the serial numbers of compliance instruments accepted by California for compliance.

(h) The Executive Officer will register into the Retirement Account compliance instruments issued by California that are used for compliance within the approved External GHG ETS, along with information identifying the External GHG ETS actually retiring the compliance instruments.

(i) If an approved External GHG ETS has taken an official act to revoke, repeal, or indefinitely suspend its ETS program or one of the linkage findings made pursuant to Government Code section 12894(f) is no longer supported, the Executive Officer

**30a**

may suspend, revoke, or repeal the approved linkage. In taking such action, the Executive Officer may limit transfers in or out of holding accounts pursuant to sections 95921 or 96011, modify auction notices pursuant to section 95912, and modify holding limits pursuant to section 95920, and cancel or issue additional allowances to ensure the environmental stringency of the California Cap-and-Trade Program is maintained as if there had not been a linkage approved with the External GHG ETS.

(1) Within 24 hours of taking action to suspend, revoke, or repeal the approved linkage, the Executive Officer shall post publicly the specific action taken with an explanation of why it was necessary to the Cap-and-Trade Program website.

(2) The public information will include:

(A) A contact name for questions regarding the action;

(B) Duration of the action, if known;

(C) Any details on the status of existing compliance instruments in accounts; and

(D) Any other relevant information.

Note: Authority cited: Sections 38510, 38560, 38562, 38570, 38571, 38580, 39600 and 39601, Health and Safety Code. Reference: Sections 38530, 38560.5, 38564, 38565, 38570 and 39600, Health and Safety Code and Section 12894, Government Code.

## HISTORY

1. New section filed 12-13-2011; operative 1-1-2012 pursuant to Government Code section 11343.4 (Register 2011, No. 50).

2. Amendment of section heading and new subsections (d)-(h) filed 6-24-2013; operative 10-1-2013 (Register 2013, No. 26).

3. Amendment of subsections (f) and (g) filed 6-26-2014; operative 7-1-2014 pursuant to Government Code section 11343.4(b) (3) (Register 2014, No. 26).

4. New subsections (i)-(i)(2)(D) and amendment of Note filed 3-29-2019; operative 3-29-2019 pursuant to Government Code section 11343.4(b)(3) (Register 2019, No. 13).

This database is current through 12/4/20 Register 2020, No. 49

17 CCR § 95942, 17 CA ADC § 95942

End of Document                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**31a**

---

Barclays Official California Code of Regulations Currentness
  Title 17. Public Health
    Division 3. Air Resources
      Chapter 1. Air Resources Board
        Subchapter 10. Climate Change
          Article 5. California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms
            Subarticle 12. Linkage to External Greenhouse Gas Emissions Trading Systems (Refs & Annos)

17 CCR § 95943

§ 95943. Linked External GHG ETS or External GHG Program.

(a) Pursuant to section 95941, covered or opt-in covered entities may use compliance instruments issued by the following programs to meet their compliance obligation under this article:

(1) Government of Quebec (effective January 1, 2014).

(2) Government of Ontario (effective January 1, 2018 through June 15, 2018). Compliance instruments issued by the Government of Ontario that are held in California covered entity, opt-in covered entity, and general market participant accounts, or that are held in approved external GHG ETS (other than Ontario) covered entity, opt-in covered entity, and general market participant accounts, as of June 15, 2018 continue to remain valid for compliance and trading purposes.

(b) Covered or opt-in covered entities may use compliance instruments issued by an external GHG ETS to which the Board has approved a Retirement-Only Limited Linkage pursuant to sections 95941 and 95944 to meet their compliance obligation under this article.

(c) Entities registered in an external GHG Program may arrange to retire California compliance instruments for purposes of compliance in their own external GHG program if ARB has approved a Retirement-Only Agreement with the external GHG Program pursuant to section 95945.

Note: Authority cited: Sections 38510, 38560, 38562, 38570, 38571, 38580, 39600 and 39601, Health and Safety Code. Reference: Sections 38530, 38560.5, 38564, 38565, 38570 and 39600, Health and Safety Code.

**HISTORY**

1. New section filed 6-24-2013; operative 10-1-2013 (Register 2013, No. 26). For prior history, see Register 2012, No. 7.

2. Amendment of section heading and section filed 9-18-2017; operative 10-1-2017 pursuant to Government Code section 11343.4(b)(3) (Register 2017, No. 38).

3. Amendment of subsection (a)(2) filed 3-29-2019; operative 3-29-2019 pursuant to Government Code section 11343.4(b)(3) (Register 2019, No. 13).

**32a**

---

This database is current through 12/4/20 Register 2020, No. 49

17 CCR § 95943, 17 CA ADC § 95943

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**33a**